### LONDON v. BIOGRAPH CO.

(Circuit Court of Appeals, Second Circuit. February 15, 1916.)

No. 104.

Copyrights ⬤⇒55—Infringement—Copying Constituting Infringement.

A copyright of a story *held* not infringed by a moving picture play, where the fundamental plot, common to both, was old, and the narrative and embellishments by which the author gave literary value to the story were not reproduced in the play.

[Ed. Note.—For other cases, see Copyrights, Cent. Dig. § 52; Dec. Dig. ⬤⇒55.]

Appeal from the District Court of the United States for the Southern District of New York.

Suit in equity by Jack London against the Biograph Company. Decree for complainant, and defendant appeals. Reversed.

This cause comes here upon appeal from a decree in favor of complainant in a suit brought under the Copyright Act. The decree awarded a permanent injunction against the production of certain motion pictures and the manufacture or sale of films therefor; it also adjudged payment of damages by the defendant in the sum of $250, with a similar amount for complainant's attorney's fee.

Robert C. Beatty, of New York City, for appellant.
Hugh A. Bayne, of New York City, for appellee.

Before LACOMBE, COXE, and ROGERS, Circuit Judges.

LACOMBE, Circuit Judge. The complainant in 1906 wrote a short story entitled "Just Meat," which he sold to the Magazine Company. It was published in the magazine and duly protected by copyright, secured by the company. Defendant prepared and exhibited in motion pictures a dramatic story, the scenes of which closely resembled those described in the story. The motion picture is entitled "Love of Gold."

The bill alleged that complainant was "the author of a certain original story entitled 'Just Meat' "; defendant traversed that allegation by an express denial. Under our decision in Bosselman v. Richardson, 174 Fed. 622, 98 C. C. A. 127, complainant should have produced testimony to support his averment. We are of the opinion, however, that defendant did not specifically call the point here raised to the attention of the trial court. Had he done so presumably, the complainant would have taken the stand, and we should have been informed to what extent, if at all, he was consciously indebted to earlier sources for the plot or incidents of the copyrighted story.

The plot of both the story and the picture play is this: Two thieves commit a burglary, capturing a large amount of money and jewelry. They return to their room and discuss, not harmoniously, the division of the plunder. Each of them succeeds, unknown to the other, in putting poison in something which the other is about to swallow. Each swallows the poison prepared by the other and both die. There are variances in the details between the story and the picture play. In the one a single burglar enters the room and murders the man therein, while the other keeps watch in the street; in the other both enter and chloroform the man in the room. In the one the story opens with one man on patrol and his partner inside; the other opens with both of them starting from their living room. In the one, burglar A goes out and buys some steak for breakfast and puts poison on part of it, while burglar B in the interim puts poison in one of the coffee cups. In the other, both remaining in the room and each ignorant of what the other is doing, A puts poison in a glass of whisky and B puts poison in a coffee cup. The fundamental idea, common to both story and picture play is the mutual poisoning of the criminals, who thus die by their own hands. Apparently that is the one strong dramatic touch, which

makes both salable. If, after the burglary, the thieves had merely escaped with their booty, or had after more or less discussion divided it between them, it is hardly likely that any one would pay good money to buy the story or to see the play. It is the swift and startling manner in which retributive justice is meted out for their crimes. Destiny, the Anangke of the old Greek drama, using their own passions, their own wills, and their own hands to effect the result, constitutes the strong point. The plot is highly dramatic and calculated to appeal powerfully to reader or spectator. But it is an old one; it appears in Chaucer's Pardoner's Tale. In the works of Chaucer edited by Rev. Walter W. Skeats and published in 1894 (vol. III, 438 to 445), earlier versions of the story are given and it is traced back to the East. Sometimes there is one robber, sometimes more; sometimes one is killed by violence and the other by poison; but in all the criminals themselves are the avengers. The same occurrence is a prominent feature in Kipling's story of the King's Ankus found in his Second Jungle Book. The plot is common property; no one by presenting it with modern incidents can appropriate it by copyrighting.

In the complainant's story there is more than this old plot; the narrative is made attractive by the introduction of physical and psychological elements. It indicates the different personal equations of the two men, their respective attitudes towards the crime committed. It has a strongly written description of the patrol kept by one burglar on watch—we are not taken into the house and do not see the crime committed; the conditions in the street, indoors and out, the passage of chance pedestrians, the dodging of a policeman on his beat, especially the abnormally developed instinct of human presence and the capacity of the foxlike thief for sensing whether it imports danger or is harmless. There is none of this in the picture play; indeed, it seems hardly possible that any amount of effort to "register" emotions could produce it on a film. Moreover, the story contains another dramatic element, not found in the play. As has been said, the man found with the jewels and money is strangled by the burglar who awakened him. From the newspaper of the next day they learn that the victim had robbed his partner and was waiting at the time and place with his plunder to take a steamer whose sailing had been delayed a few hours. Here, too, was swift and terrible retribution following crime. If the story stopped with the reading of the newspaper and the division of the burglar's booty, it would have literary merit; the same could not be said of the play, if the element of mutual poisoning were eliminated.

Of course in transferring the action of this story, centuries old, to modern times, the criminals will not be Orientals, but highwaymen or burglars; their home will not be in a cave or a hut in a wood, but in a rented room in a modern building; their surroundings will be squalid, not comprising a separate kitchen; they will perpetrate their crimes according to modern methods; if they are to be given poison, it will presumably be conveyed in meat or bread, coffee or whisky. Resemblance between the story and the play in such minor incidents are unimportant; not a single one of them is dramatic, exciting, or attractive as was the railroad scene in Under the Gaslight. The copy-

right cannot protect the fundamental plot, which was common property long before the story was written; it will protect the embellishments with which the author added elements of literary value to the old plot, but it will not operate to prohibit the presentation by some one else of the same old plot without the particular embellishments.

The decree is reversed, with costs.