## STODART v. MUTUAL FILM CORP. et al.

(District Court, S. D. New York. June 15, 1917. Supplemental Opinion, June 29, 1917.)

1. COPYRIGHTS ☞65—INFRINGEMENT.

The scene of plaintiff's play, which was duly copyrighted, was laid in the north woods, and one of its supposed merits consisted in the fact that it contained an atmosphere of local color. The plot, which was trite and conventional in the extreme and revolved around the hero, a simple-hearted poetic north woods guide, a so-called society girl, and the villain, a rich person from the city, made much of an incident whereby the hero and the society girl lost their way and were compelled to spend the night in the woods together. Defendant's motion picture play contained the same characters, and the scene was laid also in the woods, while the plot revolved around a similar incident. *Held*, that plaintiff's copyright was infringed.

2. COPYRIGHTS ☞75—INFRINGEMENT—DEFENSES.

Where defendant copied plaintiff's play in its entirety, it cannot defeat a suit for infringement of copyright on the ground that an earlier novel contained similar incidents; for, while an author, who reworks an old plot, is not entitled to protection as to the plot, he is entitled to be protected in his treatment of the same.

3. COPYRIGHTS ☞75—VALIDITY—TITLE.

Though the title of a copyrighted play was old, the entire copyright cannot be treated as invalid, and a suit for infringement, wherein the play was practically copied, defeated.

4. BROKERS ☞94—AUTHORITY TO SELL.

The mere possession of the manuscript of a play by a play broker is not of itself sufficient to give the broker authority to contract for the sale of the copyright.

5. COPYRIGHTS ☞90—INFRINGEMENT—ATTORNEY'S FEES.

Where there was a preliminary injunction, motion touching interrogatories in a suit for infringement of a copyright, and a trial of one day in the District Court, the attorney for the plaintiff, who was successful and recovered damages for the infringement, should be allowed a fee of $300.

Supplemental Opinion.

6. COPYRIGHTS ☞83—SALE—BURDEN OF PROOF.

Where defendant, who was sued for infringement of a copyrighted play, asserted the validity of its purchase of the play from a broker, who had possession of the manuscript, defendant has the burden of proving that issue.

---

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

7. BROKERS ☞94—SALES—POWER OF SALE.

Where a play broker, who was given possession of the manuscript of a copyrighted play, was required to submit to the author any offers for the motion picture rights, the broker had no authority to sell the copyright, for authority to sell implies a right under some conditions to close the bargain unconditionally.

8. BROKERS ☞103—ACTS—RATIFICATION.

Where an author, after delivering to a play broker the manuscript of a copyrighted play, with directions to submit to him any offers for the motion picture rights, took no action for two months after learning of a notice in a magazine concerning defendant's production of a motion picture play with similar incidents, but which bore a different title and was stated to have been written by another, such delay cannot be deemed a ratification of the broker's unauthorized disposal of the play.

In Equity. Suit by Robert Stodart against the Mutual Film Corporation and another for infringement of copyright. Decree for plaintiff. Decree affirmed, 249 Fed. 513, —— C. C. A. ——.

Paul N. Turner, of New York City, for plaintiff.

Elijah N. Zoline, of New York City, and James P. Grier, of Chicago, Ill., for defendants.

LEARNED HAND, District Judge. In this cause the plaintiff sues two moving picture companies for infringement of copyright of his play, "The Woodsman," by performance of the same upon the screen. It is conceded that in the year 1911 plaintiff composed a play by the title in question and secured its proper copyright under the statute in that case provided, and that the defendants have performed upon the screen a moving picture drama entitled "The Strength of Donald MacKenzie." The first question, therefore, is whether this picture is an infringement of the plaintiff's copyright.

[1] The scene of the play is the north woods of Maine, and one of its supposed merits consists in the fact that it contains an atmosphere based upon the woods and life in the woods. The plot I need not consider in great detail. It is trite and conventional in the extreme, and its only claim to originality is in the setting of the scenes, all of which are out of doors and in the supposed local color. There is a simple-hearted and poetic hero, a north woods guide, who wins the heart of a person described as a society girl, whatever that may be. The latter, who is the heroine, is at the time of the play engaged to a villain, a rich person from the city, who supports himself out of the income of filthy and squalid tenements which are outside of the law. He is a typical villain, of unqualified rascally character, who, observing the tenderness of his lady for the heroic and poetic guide, employs the usual needy tool, and with him plots to compromise the lady and the hero in such a way as to make her suppose that the hero has intended her wrong. This he does by directing his tool, who is a half-breed Indian, to change a mark upon the trail upon which the lady and the hero are to start off on the morrow. The tool does as directed, the couple are lost in the woods, and a compromise is effected sufficient to disturb the susceptibilities of the respectable. The lady doubts her hero. An imbecile father at once assumes that the hero has attempted to seduce his daughter, and all looks black for the hero and bright for the villain, as romance requires. The hero, how-

ever, induces the tool to repent upon the latter's deathbed, and he betrays the schemes of the villain, who is utterly confounded, and the couple live happily forever after.

The moving picture play is beyond question a direct copy from this plot almost in its entirety. The characters are the same. The hero is a woodsman guide with a turn for poetry, a strong father, and a poetic mother. The heroine is betrothed to a rascal in the city, who lives upon the income of foul and illegal tenements. The lady and the villain go with her father to the north woods of Maine, and there encounter the hero guide, for whom she develops a sentimental leaning, to the discomfiture of her betrothed. He thereupon suborns a half-breed villain to change the direction of a sign upon a trail upon which the lady and the hero are to leave on the morrow. The hero mistakes the trail by virtue of the sign, is compelled to spend the night with the lady in the open, to the great horror of all the respectable people who form the party and who go out in search of them. The hero's motives are at once misunderstood, both by the lady and by an imbecile father; the villain's tool is about to die from a wound, just as in the original; he repents and discloses the artifices of the villain, and the villain is thus exposed, to the eternal justification of the respectable nonentities. There are some incidents in the play which are not in the film, and some incidents in the film which are not in the play; but they are trivial and do not concern the plot. So far as infringement is concerned, the case needs no discussion.

[2] Three points of defense are raised: First, that the play was in the public domain and was not entitled to protection. Nothing of the sort has been proved. The nearest approach is a play based upon Mr. Owen Davis' novelette, entitled "The Sentimental Lady," which was dramatized under the title "An Everday Man." There are incidents in that play which are similar to those of the plaintiff's play. There is no reason to suppose one is copied from the other. The points of similarity are only these: That the scene takes place in the woods of the Adirondacks; that the lady and the hero are compromised by being left on a desert island for a short time. The hero, however, is not a poetic and romantic guide, but, strangely enough, a lawyer. The villain, who has nothing to do with illegal tenements, does not attempt to compromise his lady and the hero, so that the hero's motives shall be misconstrued; there is no change of the mark on the trail, no confession. There is nothing between the two but a similarity of incident, already mentioned. Now, incident is different from plot. It may be said that the incidents here are like those in the plaintiff's play, but that the plots are quite different, and the question here is of plot.

The defendant relies upon the case of London v. Biograph, 231 Fed. 696, 145 C. C. A. 582, in which Judge Lacombe held that, where the copyrighted plot was in the public domain, it could not be protected. This, of course, is true; but in that case it could be said that the supposed infringement was no nearer to the copyrighted plot than the copyrighted plot was to the plots in the public domain. If that had been true in this case, the case would apply; but the defendants have copied the plaintiff's copyright much more nearly than that which

resembles anything which is in the public domain. A man may take an old story and work it over, and if another copies, not only what is old, but what the author has added to it when he worked it up, the copyright is infringed. It cannot be a good copyright, in the broader sense that all features of the plot or the bare outlines of the plot can be protected; but it is a good copyright in so far as the embellishments and additions to the plot are new and have been contributed by the copyright. That is this case. Therefore the first defense I overrule.

[3] The second defense is that, because the title, "The Woodsman," was old as applied to plays, therefore the whole copyright is invalid. I cannot see how any one can think so. The title has not been copied by the defendants, and the copyright of the title may be invalid. On that question I have nothing to say. But the idea that because a part of the copyright is invalid it cannot be protected in any part is a strange and new doctrine. If it had been shown that Mr. Stodart deliberately plagiarized the title from some one else, it might be arguable that he could not bring a suit in this court under the doctrine of unclean hands; but nothing of that sort was true, and, indeed, nothing of the sort was even asserted. Therefore I overrule the second point.

[4] The only remaining point is the question of defendant's title to the play. It is undoubtedly true that before April 25, 1916, Stodart had given the manuscript of this play to one Russell E. Smith, a play broker, who seems to have disappeared, and that subsequently on April 25, 1916, he wrote him a letter in which he said:

"You will kindly try to sell for me the film rights only; contract, of course, to be submitted to me."

In this letter he told him that in no case should he accept less than $500 cash down, and, if possible, $500 with future rights. We have no evidence in the case from Mr. Stodart, who was the only witness called, as to the circumstances under which he let Smith have a copy of the play before April 25, 1916, and the case must be judged upon the assumption that he gave him no express power of sale certainly before that date. The first question, then, is whether the mere possession of the manuscript of a play by a play broker is of itself sufficient to give him an authority to make a contract for the sale of the copyright. The mere statement of that proposition seems to me to be its answer. Even were this not an incorporeal hereditament, but a chattel, the mere possession without power of sale would not conclude the owner. Whatever may be the effect of the most recent legislation in Great Britain, neither judicial decision nor legislative act has gone so far in this country as to create any such implied power of sale where one was intended. Therefore on March 23, 1916, the date of Smith's conveyance to the defendant, so far as this case shows, he had no power to sell.

I pass the question whether a sale in his own name, which is what he made, would be a valid exercise of the power. If Stodart had later learned of Smith's sale, and had by inaction ratified it, that would be sufficient; but there is no evidence that he did, and there is affirmative evidence that he did not. It may even be that if, by the letter of April 25, 1916, Stodart had given Smith a right to make such a sale as Smith had in fact actually made, that would be the equiva-

lent of a ratification. That question likewise I pass, for it is clear that he gave him no such right by that letter, because the letter created no power to sell at all, but required, as was expressly stated, that any contract of sale should be submitted to Stodart before it was closed. This was in effect nothing more than giving a power to take an offer from a prospective buyer and submitting it to Stodart.

It therefore becomes unnecessary to decide whether, if Smith had had a power to sell the copyright without reference back to Stodart, his disregard of instructions not to sell for less than $500 would have concluded the owner. Probably that is the case, but I need not so decide. The effective point of difference is that, by refusing to allow him to close a contract without submission to himself, Stodart did not give him any express power of sale, and, as I have said, did not, by intrusting with him the manuscript of the play, give him any implied or apparent authority to sell.

It therefore follows that the plaintiff is entitled to the usual decree, that is, to an injunction and accounting, and there remain only two other questions: First, the damages; and, second, the allowance to the plaintiff's attorney.

The parties wish me to fix the damages now and without taking any further testimony on the subject. So far as the value of the play goes, I should accept Mr. Stodart's own figure in the letter of April 25, 1916, which is $500, and that value I do fix. But he says that I should allow something more, because in fixing that value he supposed that he would get the publicity of his own name upon the advertisements of the play, which has had on the motion-picture screen a considerable vogue. I cannot, of course, tell what the value of that publicity would be to the plaintiff; at best it must be in the nature of a guess, but as the parties wish me to fix it now, and without going into any further evidence touching the success of the play, I will fix it at $400, making $900 in all.

[5] Next comes the question of Mr. Turner's allowance as attorney for the plaintiff. There has been a preliminary injunction motion touching the interrogatories and a trial of one day in this court. The interrogatories were somewhat troublesome. Taking everything into consideration, I will allow him a fee of $300, making a total of $1,200, together with the costs of the suit. As the plaintiff wishes in addition an account of damages, an accounting will be provided in the decree, as already stated, which will be before Mr. Philip L. Miller, 51 Wall street. The question of who shall bear the expense of the accounting in case no profits are shown will come up after the master has reported.

## Supplemental Opinion.

This is a reargument of the cause, based wholly upon the theory that Smith's possession of the manuscript was sufficient color of authority to give him power of sale, and that the plaintiff's subsequent inaction after learning of the proposed motion play ratified Smith's sale.

[6, 7] The first point is based upon the theory that Smith was a factor, and that, having possession, he could give a title. I pass the questions whether the New York Factors Act (section 43 of the Personal Property Law [Consol. Laws, c. 41]) could possibly cover the sale of an incorporeal right like copyright, under the phrase

"merchandise," because it is clear in any event that the supposed factor must at least be intrusted with the "merchandise" for purposes of sale. The evidence in the case fails upon second scrutiny as much as on first to justify the affirmative conclusion—the defendant having the burden—that Smith held the manuscript for purposes of· sale. Just what their arrangement was before April 25, 1916, it is indeed impossible to tell, except by inference, because Smith, who, so far as appears, was quite available, was not called, and Stodart who alone was examined, would or could tell nothing definite about it. · That Smith had written him a letter appears certain from the letter of April 25, 1916, which purports to be an answer. That earlier letter. Stodart says was only to say that he would like to sell the film rights. It seems most probable that he did not have the manuscript at that time, and under what circumstances he got it we do not know. All that Stodart would say was that in a talk some weeks earlier he had said to Smith that he would like to sell the play, if he could get a good price for it. Assuming that he gave Smith the manuscript after that, it would by no means follow that he gave it to him for the purpose of sale. It is at least equally consistent—indeed, I think more so—that he should have let him have it merely to show it to prospective purchasers, so that they might make any offers upon it.

Even if the letter of April 25, 1916, had contained a power of sale, it would by no means follow that the same power existed when Smith did sell; but that letter did not in fact grant such a power, if it had been earlier. The acceptance of any offer was to be subject to its submission to Stodart, which effectively took from Smith a power to sell. Such a power implies a right in the agent under some conditions to close the bargain unconditionally; it can never exist unless there is some right to bind the principal without any subsequent assent. Thacher v. Moors, 134 Mass. 156; Biggs v. Evans, [1894] 1 Q. B. 88.

[8] The second point is whether Stodart learned of the proposed play so long before he took action as to ratify Smith's sale. This aspect of the case is dealt with in the briefest possible way on the trial. All that appears is that the notice in the Moving Picture World of June 10, 1916, came to Stodart's knowledge about two months before the play was produced. To learn what that notice was we must turn to Stodart's affidavit of January 2, 1917, in which he says that the account of the plot was similar, so far as it went, to that of "The Woodsman," but that the author was stated to be William Russell. This may have been enough to put him on inquiry for a possible infringement, but it hardly indicated that Smith had sold the play, even though he had not returned it. Even if it be thought sufficient to require some action, Stodart's letter of September 28, 1916, was an inquiry proper for the case. He was justified in assuming at first, anyway, that Smith had not turned knave. There is no evidence that the delay actually prejudiced the defendant, and the period of two months is not sufficient, of itself and unexplained, to impute a ratification by inaction, assuming that there can be any ratification at all until the principal has full knowledge of the facts.

I think, considering the very trifling character of the play, that I fixed the damages too high. Instead of $900, I shall award $500, with $300 counsel fee, and an accounting, if the plaintiff desires.