## NICHOLS v. UNIVERSAL PICTURES CORPORATION et al.

### No. 4.

Circuit Court of Appeals, Second Circuit.

Nov. 10, 1930.

O'Brien, Malevinsky & Driscoll, of New York City (Isaac R. Oeland and M. L. Malevinsky, both of New York City, of counsel), for appellant.

Siegfried F. Hartman, of New York City (Nathan L. Miller and Siegfried F. Hartman, both of New York City, of counsel), for appellees.

120

Before L. HAND, SWAN, and AUGUSTUS N. HAND, Circuit Judges.

L. HAND, Circuit Judge.

The plaintiff is the author of a play, "Abie's Irish Rose," which it may be assumed was properly copyrighted under section five, subdivision (d), of the Copyright Act, 17 USCA § 5(d). The defendant produced publicly a motion picture play, "The Cohens and The Kellys," which the plaintiff alleges was taken from it. As we think the defendant's play too unlike the plaintiff's to be an infringement, we may assume, arguendo, that in some details the defendant used the plaintiff's play, as will subsequently appear, though we do not so decide. It therefore becomes necessary to give an outline of the two plays.

"Abie's Irish Rose" presents a Jewish family living in prosperous circumstances in New York. The father, a widower, is in business as a merchant, in which his son and only child helps him. The boy has philandered with young women, who to his father's great disgust have always been Gentiles, for he is obsessed with a passion that his daughter-in-law shall be an orthodox Jewess. When the play opens the son, who has been courting a young Irish Catholic girl, has already married her secretly before a Protestant minister, and is concerned to soften the blow for his father, by securing a favorable impression of his bride, while concealing her faith and race. To accomplish this he introduces her to his father at his home as a Jewess, and lets it appear that he is interested in her, though he conceals the marriage. The girl somewhat reluctantly falls in with the plan; the father takes the bait, becomes infatuated with the girl, concludes that they must marry, and assumes that of course they will, if he so decides. He calls in a rabbi, and prepares for the wedding according to the Jewish rite.

Meanwhile the girl's father, also a widower, who lives in California, and is as intense in his own religious antagonism as the Jew, has been called to New York, supposing that his daughter is to marry an Irishman and a Catholic. Accompanied by a priest, he arrives at the house at the moment when the marriage is being celebrated, but too late to prevent it, and the two fathers, each infuriated by the proposed union of his child to a heretic, fall into unseemly and grotesque antics. The priest and the rabbi become friendly, exchange trite sentiments about religion, and agree that the match is good. Apparently out of abundant caution, the priest celebrates the marriage for a third time, while the girl's father is inveigled away. The second act closes with each father, still outraged, seeking to find some way by which the union, thus trebly insured, may be dissolved.

The last act takes place about a year later, the young couple having meanwhile been abjured by each father, and left to their own resources. They have had twins, a boy and a girl, but their fathers know no more than that a child has been born. At Christmas each, led by his craving to see his grandchild, goes separately to the 'young folks' home, where they encounter each other, each laden with gifts, one for a boy, the other for a girl. After some slapstick comedy, depending upon the insistence of each that he is right about the sex of the grandchild, they become reconciled when they learn the truth, and that each child is to bear the given name of a grandparent. The curtain falls as the fathers are exchanging amenities, and the Jew giving evidence of an abatement in the strictness of his orthodoxy.

"The Cohens and The Kellys" presents two families, Jewish and Irish, living side by side in the poorer quarters of New York in a state of perpetual enmity. The wives in both cases are still living, and share in the mutual animosity, as do two small sons, and even the respective dogs. The Jews have a daughter, the Irish a son; the Jewish father is in the clothing business; the Irishman is a policeman. The children are in love with each other, and secretly marry, apparently after the play opens. The Jew, being in great financial straits, learns from a lawyer that he has fallen heir to a large fortune from a great-aunt, and moves into a great house, fitted luxuriously. Here he and his family live in vulgar ostentation, and here the Irish boy seeks out his Jewish bride, and is chased away by the angry father. The Jew then abuses the Irishman over the telephone, and both become hysterically excited. The extremity of his feelings makes the Jew sick, so that he must go to Florida for a rest, just before which the daughter discloses her marriage to her mother.

On his return the Jew finds that his daughter has borne a child; at first he suspects the lawyer, but eventually learns the truth and is overcome with anger at such a low alliance. Meanwhile, the Irish family who have been forbidden to see the grandchild, go to the Jew's house, and after a violent scene between the two fathers in which the Jew disowns his daughter, who decides to go back with her husband, the Irishman takes her back with her baby to his own poor lodg-

ings. The lawyer, who had hoped to marry the Jew's daughter, seeing his plan foiled, tells the Jew that his fortune really belongs to the Irishman, who was also related to the dead woman, but offers to conceal his knowledge, if the Jew will share the loot. This the Jew repudiates, and, leaving the astonished lawyer, walks through the rain to his enemy's house to surrender the property. He arrives in great dejection, tells the truth, and abjectly turns to leave. A reconciliation ensues, the Irishman agreeing to share with him equally. The Jew shows some interest in his grandchild, though this is at most a minor motive in the reconciliation, and the curtain falls while the two are in their cups, the Jew insisting that in the firm name for the business, which they are to carry on jointly, his name shall stand first.

It is of course essential to any protection of literary property, whether at common-law or under the statute, that the right cannot be limited literally to the text, else a plagiarist would escape by immaterial variations. That has never been the law, but, as soon as literal appropriation ceases to be the test, the whole matter is necessarily at large, so that, as was recently well said by a distinguished judge, the decisions cannot help much in a new case. Fendler v. Morosco, 253 N. Y. 281, 292, 171 N. E. 56. When plays are concerned, the plagiarist may excise a separate scene [Daly v. Webster, 56 F. 483 (C. C. A. 2); Chappell v. Fields, 210 F. 864 (C. C. A. 2); Chatterton v. Cave, L. R. 3 App. Cas. 483]; or he may appropriate part of the dialogue (Warne v. Seebohm, L. R. 39 Ch. D. 73). Then the question is whether the part so taken is "substantial," and therefore not a "fair use" of the copyrighted work; it is the same question as arises in the case of any other copyrighted work. Marks v. Feist, 290 F. 959 (C. C. A. 2); Emerson v. Davies, Fed. Cas. No. 4436, 3 Story, 768, 795–797. But when the plagiarist does not take out a block in situ, but an abstract of the whole, decision is more troublesome. Upon any work, and especially upon a play, a great number of patterns of increasing generality will fit equally well, as more and more of the incident is left out. The last may perhaps be no more than the most general statement of what the play is about, and at times might consist only of its [ti]but there is a point in this series of [abstrac]tions where they are no longer pro[tected, sinc]e otherwise the playwright could [prevent the use] of his "ideas," to which, apart [from their expre]ssion, his property is never [extended. Holmes] v. Hurst, 174 U. S. 82, 86,

19 S. Ct. 606, 43 L. Ed. 904; Guthrie v. Curlett, 36 F.(2d) 694 (C. C. A. 2). Nobody has ever been able to fix that boundary, and nobody ever can. In some cases the question has been treated as though it were analogous to lifting a portion out of the copyrighted work (Rees v. Melville, MacGillivray's Copyright Cases [1911–1916], 168); but the analogy is not a good one, because, though the skeleton is a part of the body, it pervades and supports the whole. In such cases we are rather concerned with the line between expression and what is expressed. As respects plays, the controversy chiefly centers upon the characters and sequence of incident, these being the substance.

We did not in Dymow v. Bolton, 11 F. (2d) 690, hold that a plagiarist was never liable for stealing a plot; that would have been flatly against our rulings in Dam v. Kirk La Shelle Co., 175 F. 902, 41 L. R. A. (N. S.) 1002, 20 Ann. Cas. 1173, and Stodart v. Mutual Film Co., 249 F. 513, affirming my decision in (D. C.) 249 F. 507; neither of which we meant to overrule. We found the plot of the second play was too different to infringe, because the most detailed pattern, common to both, eliminated so much from each that its content went into the public domain; and for this reason we said, "this mere subsection of a plot was not susceptible of copyright." But we do not doubt that two plays may correspond in plot closely enough for infringement. How far that correspondence must go is another matter. Nor need we hold that the same may not be true as to the characters, quite independently of the "plot" proper, though, as far as we know, such a case has never arisen. If Twelfth Night were copyrighted, it is quite possible that a second comer might so closely imitate Sir Toby Belch or Malvolio as to infringe, but it would not be enough that for one of his characters he cast a riotous knight who kept wassail to the discomfort of the household, or a vain and foppish steward who became amorous of his mistress. These would be no more than Shakespeare's "ideas" in the play, as little capable of monopoly as Einstein's Doctrine of Relativity, or Darwin's theory of the Origin of Species. It follows that the less developed the characters, the less they can be copyrighted; that is the penalty an author must bear for marking them too indistinctly.

In the two plays at bar we think both as to incident and character, the defendant took no more—assuming that it took anything at all—than the law allowed. The stories are quite different. One is of a religious zealot

who insists upon his child's marrying no one outside his faith; opposed by another who is in this respect just like him, and is his foil. Their difference in race is merely an obbligato to the main theme, religion. They sink their differences through grandparental pride and affection. In the other, zealotry is wholly absent; religion does not even appear. It is true that the parents are hostile to each other in part because they differ in race; but the marriage of their son to a Jew does not apparently offend the Irish family at all, and it exacerbates the existing animosity of the Jew, principally because he has become rich, when he learns it. They are reconciled through the honesty of the Jew and the generosity of the Irishman; the grandchild has nothing whatever to do with it. The only matter common to the two is a quarrel between a Jewish and an Irish father, the marriage of their children, the birth of grandchildren and a reconciliation.

If the defendant took so much from the plaintiff, it may well have been because her amazing success seemed to prove that this was a subject of enduring popularity. Even so, granting that the plaintiff's play was wholly original, and assuming that novelty is not essential to a copyright, there is no monopoly in such a background. Though the plaintiff discovered the vein, she could not keep it to herself; so defined, the theme was too generalized an abstraction from what she wrote. It was only a part of her "ideas."

Nor does she fare better as to her characters. It is indeed scarcely credible that she should not have been aware of those stock figures, the low comedy Jew and Irishman. The defendant has not taken from her more than their prototypes have contained for many decades. If so, obviously so to generalize her copyright, would allow her to cover what was not original with her. But we need not hold this as matter of fact, much as we might be justified. Even though we take it that she devised her figures out of her brain de novo, still the defendant was within its rights.

There are but four characters common to both plays, the lovers and the fathers. The lovers are so faintly indicated as to be no more than stage properties. They are loving and fertile; that is really all that can be said of them, and anyone else is quite within his rights if he puts loving and fertile lovers in a play of his own, wherever he gets the cue. The plaintiff's Jew is quite unlike the defendant's. His obsession is his religion, on which depends such racial animosity as he has.

He is affectionate, warm and patriarchal. None of these fit the defendant's Jew, who shows affection for his daughter only once, and who has none but the most superficial interest in his grandchild. He is tricky, ostentatious and vulgar, only by misfortune redeemed into honesty. Both are grotesque, extravagant and quarrelsome; both are fond of display; but these common qualities make up only a small part of their simple pictures, no more than any one might lift if he chose. The Irish fathers are even more unlike; the plaintiff's a mere symbol for religious fanaticism and patriarchal pride, scarcely a character at all. Neither quality appears in the defendant's, for while he goes to get his grandchild, it is rather out of a truculent determination not to be forbidden, than from pride in his progeny. For the rest he is only a grotesque hobbledehoy, used for low comedy of the most conventional sort, which any one might borrow, if he chanced not to know the exemplar.

The defendant argues that the case is controlled by my decision in Fisher v. Dillingham (D. C.) 298 F. 145. Neither my brothers nor I wish to throw doubt upon the doctrine of that case, but it is not applicable here. We assume that the plaintiff's play is altogether original, even to an extent that in fact it is hard to believe. We assume further that, so far as it has been anticipated by earlier plays of which she knew nothing, that fact is immaterial. Still, as we have already said, her copyright did not cover everything that might be drawn from her play; its content went to some extent into the public domain. We have to decide how much, and while we are as aware as any one that the line, wherever it is drawn, will seem arbitrary, that is no excuse for not drawing it; it is a question such as courts must answer in nearly all cases. Whatever may be the difficulties a priori, we have no question on which side of the line this case falls. A comedy based upon conflicts between Irish and Jews, into which the marriage of their children enters, is no more susceptible of copyright than the outline of Romeo and Juliet.

The plaintiff has prepared an elaborate analysis of the two plays, showing a "quadrangle" of the common characters, in which each is represented by the emotions which he discovers. She presents the resulting parallelism as proof of infringement, but the jectives employed are so general as to useless. Take for example the "love" ascribed to both Jews. has depicted her father as

to his son, who is his hope and joy; not so, the defendant, whose father's conduct is throughout not actuated by any affection for his daughter, and who is merely once overcome for the moment by her distress when he has violently dismissed her lover. "Anger" covers emotions aroused by quite different occasions in each case; so do "anxiety," "despondency" and "disgust." It is unnecessary to go through the catalogue for emotions are too much colored by their causes to be a test when used so broadly. This is not the proper approach to a solution; it must be more ingenuous, more like that of a spectator, who would rely upon the complex of his impressions of each character.

We cannot approve the length of the record, which was due chiefly to the use of expert witnesses. Argument is argument whether in the box or at the bar, and its proper place is the last. The testimony of an expert upon such issues, especially his cross-examination, greatly extends the trial and contributes nothing which cannot be better heard after the evidence is all submitted. It ought not to be allowed at all; and while its admission is not a ground for reversal, it cumbers the case and tends to confusion, for the more the court is led into the intricacies of dramatic craftsmanship, the less likely it is to stand upon the firmer, if more naïve, ground of its considered impressions upon its own perusal. We hope that in this class of cases such evidence may in the future be entirely excluded, and the case confined to the actual issues; that is, whether the copyrighted work was original, and whether the defendant copied it, so far as the supposed infringement is identical.

■ The defendant, "the prevailing party," was entitled to a reasonable attorney's fee (section 40 of the Copyright Act [17 USCA § 40]).

Decree affirmed.