**SHELDON et al. v. METRO–GOLDWYN PICTURES CORPORATION et al.**

District Court, S. D. New York.

July 25, 1934.

O'Brien, Driscoll & Raftery, of New York City (Dennis F. O'Brien, Arthur F. Driscoll, Edward J. Clark, and Sidney G. Rosenbloom, all of New York City, of counsel), for plaintiffs.

J. Robert Rubin and Nathan Burkan, both of New York City (Nathan Burkan, Louis D. Frohlich, David O. Decker, H. Finkelstein, and Samuel D. Cohen, all of New York City, of counsel), for defendants.

WOOLSEY, District Judge.

My decision herein is that the bill of complaint must be dismissed, but without costs.

I. This is a suit in equity based on alleged infringement of the copyright of the plaintiffs' play "Dishonored Lady," copyrighted by them on January 18, 1930, by the motion picture photoplay "Letty Lynton," copyrighted in the name of the defendant Metro-Goldwyn-Mayer Distributing Corporation on May 6, 1932.

This cause is unusually complicated because of the number of books and manuscripts involved.

The whole situation stems from a somewhat celebrated murder trial which was held in Edinburgh in 1857 in which a girl named Madeleine Smith was prosecuted in connection with the murder of her lover on three counts—on the first two counts for attempted murder, and on the third count for murder—with the result that she was acquitted on the first two counts, and on the third count a verdict, allowed in the Scotch courts, of "Not proven" was returned.

A description of the trial of Madeleine Smith was published in October, 1905, by William Hodge & Co., Limited, in Great Britain, in a series of books dealing with "Notable Scottish Trials," under the editorship of A. Duncan Smith. It was reprinted in that series twice; in December, 1905, and in February, 1914. It was subsequently reprinted in a series of books called "Notable British Trials" in March, 1921, under the same editorship. A new edition thereof, edited by F. Tennyson Jesse, was published in April, 1927, in the "Notable British Trials" series. It is that edition which has been submitted to me. It will be hereinafter referred to as the Trial.

The play "Dishonored Lady" was written by the plaintiffs in collaboration during the years 1927 and 1928. In it on the title page occurs this notation: "The authors salute with gratitude Miss Madeleine Smith of Glasgow whose conduct in 1857 suggested to them this play. Accordingly they make a friendly and admiring bow to her across the years."

The play was copyrighted as an unpublished dramatic composition on January 18, 1930, at the Copyright Office of the United States. It will be hereinafter referred to as the Play.

In the latter part of 1928 or early in 1929, Mrs. Belloc Lowndes consulted with the fiction editor of the London Daily Mail, Mr. Langley Edwards, now deceased, in regard to the idea of a novel which was afterwards called "Letty Lynton." She submitted a synopsis thereof to him. This was approved, and "Letty Lynton" was first published in the London Daily Mail in London as a serial story between May and July, 1930; but it was not published in book form until January 1, 1931, when it was brought out in Great Britain by the Vail Ballou Press of Birmingham, England.

In her foreword to the novel, Mrs. Lowndes wrote: "Although many readers will realize that the two chief characters of Letty Lynton were suggested by a famous Scottish murder trial, the writer wishes to make clear that this story is fiction. In writing it she has not reread or referred to any of the numerous accounts of that trial."

"Letty Lynton" will be referred to hereinafter as the Novel.

It is stipulated that the whole of the Novel is Mrs. Lowndes' own work and does not constitute any infringement of the copyright of the Play, and it necessarily is common ground that both the Play and the Novel were inspired by the Trial.

The motion picture photoplay "Letty Lynton," which is claimed to have infringed the plaintiffs' copyright of the play "Dishonored Lady," was produced from what was called on this trial Continuity No. 1. This is in evidence before me. After its production, what was called on the trial, Continuity No. 2, described as dialogue cutting continuity, was taken down from and represented the finished photoplay. This was duly copyrighted by the defendant Metro-Goldwyn-Mayer Distributing Corporation on May 6, 1932, and will be hereinafter referred to as the Picture.

Having thus set forth what I may perhaps properly call the dramatis personæ of the situation with which I have to deal herein and of which the Play and the Picture are the opposing protagonists, I will now turn back to some of the dates which it may be convenient to have recorded.

II. I have already mentioned that the Play was copyrighted on January 18, 1930.

It was first produced outside New York some time in January, 1930, and opened in New York City on February 4, 1930, and, after a comparatively successful run in which

Miss Katherine Cornell acted the role of the heroine therein, called Madeleine Cary, closed in New York City about May 24, 1930.

The Play was produced by Charles Frohman, Inc., whereof Mr. Gilbert Miller was managing director. On February 5, 1930, the acting version thereof was submitted, through Mr. Miller, to Mr. Rubin, the attorney of record for the defendants Metro-Goldwyn-Mayer Distributing Corporation and Metro-Goldwyn Pictures Corporation.

This acting version of the Play was forwarded by Mr. Rubin to Mr. Thalberg, the vice president in charge of production, of the Metro-Goldwyn-Mayer Corporation. It was returned by him to Mr. Rubin and by Mr. Rubin to Mr. Miller on or about March 26, 1930, on the ground that Mr. Will Hays, the movie censor, would not permit the production of its acting version as a photoplay.

The Play opened in London about May 7, 1930, with Miss Fay Compton in the title role.

Between September 8 and 20, 1930, the Play was presented in Los Angeles, Cal. Then it went on the road coming East and playing in Boston, Philadelphia, Baltimore, and Chicago, and closing about Christmas, 1930.

About November, 1930, in a new endeavor to get around the censorship of Mr. Hays, the plaintiffs prepared a Treatment of the Play which they delivered to Mr. Rubin and which was marked in evidence before me. This Treatment was confessedly not the same story as the Play. It was not copyrighted, and was merely an attempt, by changing the story of the Play, to enable the defendant interests to purchase the moving picture rights thereof for production.

Mr. Rubin mailed the Treatment to Mr. Thalberg on or about December 3, 1930, and it was returned by Mr. Thalberg on December 16, 1930, to Mr. Rubin, and by him returned to the plaintiffs.

The Play, which I think has unusual dramatic merit, seems so greatly to have appealed to the defendants that, in spite of Mr. Hays' continued attitude of disapproval, on or about April 14, 1931, a contract for the purchase of the moving picture rights thereof by the defendant interests was drawn up and signed by Charles Frohman, Inc., and by Mrs. Barnes. This contract was conditioned on the withdrawal of Mr. Hays' objections, and in such event the purchase price was to be $30,000.

It might be noted, perhaps, in this connection, that Mr. Stromberg, the associate producer for the defendants, claims that he first read the Novel in January, 1931.

In June, 1931, some time after the contract above referred to was drafted, a conference was held in California with regard to the purchase of the Play thereunder by the defendant interests. At that conference there were Mr. Hays and Messrs. Mayer, Thalberg, Stromberg, and Lasky, representing the defendant interests. Mr. Hays still refused to lift his ban, and, consequently, the matter of the sale of the motion picture rights of "Dishonored Lady" to the defendant interests was finally dropped.

Up to this point it is common ground that there were complete bona fides on both sides, and there is not any criticism made of anything that happened up to this point.

III. In July, 1931, Mrs. Schley, a literary agent and play broker, spoke to Mr. Thalberg, who was the vice president in charge of production of the Metro-Goldwyn-Mayer Corporation, about the Novel which Mr. Stromberg, as above noted, had apparently read in January, 1931, and suggested that it would make a good photoplay for Miss Joan Crawford, who later acted the part of the heroine in the Picture.

Finally, after some negotiations through Mrs. Schley, the novel was purchased on December 4, 1931, from Mrs. Belloc Lowndes for the sum of $3,500.

Mr. Stromberg has testified that he first read the Trial of Madeleine Smith in November, 1931, and apparently work began on the scenario for the picture on December 1, 1931, when, although there had been negotiations for the purchase of the Novel, it had not as yet actually been purchased.

The Picture was produced between February 21 and March 28, 1932. What we have called at the trial and argument Continuity No. 1 was used in the photographing thereof. That continuity was changed from time to time during the process of production, and the completed Picture, which obviously can alone be challenged by the plaintiffs as a possible infringement of their Play, was finally represented by what we have called herein Continuity No. 2.

The Picture was released on April 28, 1932.

IV. As there was admitted access in this case, the oral evidence is not of great importance; so I shall not deal with the criticism

by the plaintiffs' counsel of the fact that the defendants examined their California witnesses by commission on written interrogatories and cross-interrogatories otherwise than to say that plaintiffs' counsel consented to that method of examination when, it seems to me, if they wished a chance for an oral cross-examination, they might have insisted on having depositions de bene esse taken under the statute.

■ V. For a long period, as I worked from time to time on the case, I considered making summaries of the Trial, the Play, the Novel, and the Picture, but after drafting some such summaries, I made up my mind that they would merely extend this opinion to undue length, without adding anything to its value as an expression of my reasons for deciding the case in the defendants' favor.

I finally decided, therefore, to deal with this case on the basis of what may be called perhaps the common denominator of the four different works here involved, observed against the background of their common origin, the actual trial of Madeleine Smith, which has always been entirely in the public domain.

■ VI. If access were an issue herein, the plaintiffs' so-called external evidence of copying by the defendants, such as the similarity of the still photographs, the similarity in the advertising of the Play and the Picture, and other details of alleged resemblances, might be of value as showing that there had been access. But as none of the elements mentioned in the so-called external evidence were protected by copyright, the external evidence does not I think add anything to the plaintiffs' case. Certainly it is not a basis for a claim of infringement.

The plaintiffs' so-called Treatment, written in an endeavor to get around the Hays censorship, is admittedly an entirely different story from that of the Play.

The Treatment was not copyrighted. It was submitted to the defendants some time in November, 1930, as above noted. It has in it a shipboard courtship. It has in it a young polo player. It has a scene in which Madeleine stabs Moreno to protect her honor on her wedding eve. Finally, the next day she flies to an old friend for help, marries him, and then they start together for Japan. There is not any poison scene, or any investigation scene in the Treatment.

It seems probable that when the scenario of the Picture came to be written some types of scenes possibly suggested by the Treatment may have been included, but as the Treatment was not copyrighted, the use of such scenes does not constitute an infringement of the Play.

Furthermore, all the scenes are obviously matters in the public domain which anybody can use, so the Treatment, if it has any relevancy whatever, can only be relevant in connection with the so-called external evidence, which itself, as above stated, has become valueless in view of the fact that access is admitted.

So we must now turn to a consideration of the Play and the Picture to determine whether any infringement of the plaintiffs' copyright has occurred.

■ VII. The basic plot—the common denominator—underlying the situation here is that which is implicit in the evidence for the prosecution at the Trial.

It is this:

A young and attractive woman of naturally passionate temperament becomes involved in an affair with a young man, hereinafter called for convenience the Villain, of a social position somewhat inferior to hers. Except in the Novel, this affair is a liaison involving sexual intercourse.

In the course of time, in the development of each work here under consideration, the girl, hereinafter referred to as the Heroine, decides that the liaison must end.

The motive for this decision in the Trial seems merely to have been a desire to make a marriage of a more suitable kind socially than marriage with the Villain would be.

In the Play, the Novel, and the Picture the Heroine falls genuinely in love with some one else, of a suitable station in life, and wishes to get rid of the Villain and start anew. The effort to do this leads in each work, though the details differ somewhat, to a clash with the Villain, who in each work, except in the Play, holds letters from the Heroine which, unless they are secured from him, are of a nature so compromising as to constitute a continued threat overhanging her happiness and reputation.

The principal dramatic elements of the situation which obviously appealed to the plaintiffs as well as to the defendants lies in three scenes:

1. The threat scene, in which the Villain threatens exposure of the Heroine to her parents, her friends, and the public of her social circle and treats her with some roughness.

2. The poison scene, in which the Heroine meets the Villain by appointment, and, after

failure to clear the situation, the Villain dies of poison—in the Trial supposedly administered by the Heroine; both in the Play and the Novel admittedly so administered with intent to murder, and, in the Picture, by the Villain's drinking a glass of poisoned wine, which, I think, a fair reading of the copyrighted continuity and observation of the Picture shows was intended by the Heroine to be taken by herself in case she should fail to get back her letters.

3. The investigation scene, in which the death of the Villain is examined into by the authorities, resulting severally: In the Trial, in acquittal on two counts of attempted murder, and a Scotch verdict of "Not proven" on the murder charge; in the Play, after a trial, in acquittal based apparently on what we called on the argument a false sex alibi, i. e., a false assertion on the Heroine's part that on the night of the Villain's death, she had been staying in the rooms of another man, an old friend who is thus requisitioned to save her and assumes the burden of the accusation; in the Novel, a coroner's inquest which is rendered abortive by a false alibi as to a motor breakdown which accounts for the time when the poison could have been administered to the Villain by the Heroine; and in the Picture, in the district attorney's dropping charges against the Heroine, after a somewhat incredible scene wherein he is faced by a false sex alibi similar to that of the Play, except that in the Picture the Heroine's fiancé volunteers the alibi, and is backed up therein by her mother and an old servant.

The dénouement of the Trial, the Novel, and the Play is tragic for the Heroine, for in each she loses her real love, and has to marry a man for whom she does not care. In the Picture the ending is happy.

VIII. The Trial was one of the most dramatic of the Victorian era, and the plaintiffs and Mrs. Belloc Lowndes chose well in making it, respectively, the basis of the Play and the Novel.

The inherent drama of the three principal scenes above mentioned and their effect on readers of the story of the Trial, on audiences of the Play, and on readers of the Novel is necessarily substantially the same. The same emotions are aroused in the same order, to wit, resentment at the Villain's attitude to a beautiful girl; horror, mixed perhaps with a lurking sympathy, at the means which the girl chooses for her escape from him; and suspense, and some sympathy for the Heroine when the forces of government are arrayed against her, followed by a feeling, which might be characterized as relief, tinctured with a little resentment, in seeing a woman escape from those forces with such apparent ease.

The Picture plays on the same emotions but in a slightly different manner, for in the Picture the Heroine did not commit murder, and she, therefore, has a sympathy from her audience which would probably be lacking in an audience or a reader of the Play and in readers of the Novel or the Trial.

IX. Now, as above observed, there is not any question but that there was access in this case.

It is common ground that the defendants' employees who wrote the scenario of the Picture and arranged the continuity from which it was made had the acting copy of the Play for some months, had seen the Play on the stage in Los Angeles in May, 1931, and had also read the Treatment thereof made by the plaintiffs in the hope of escaping the Hays' censorship which lay athwart the path of their efforts to sell the moving picture rights of the Play to the defendant interests.

When, therefore, the defendant interests purchased the moving picture rights of the Novel from Mrs. Belloc Lowndes and started to write the scenario for the Picture, they were in a somewhat curious position. They had the right to use the basic plot by purchase as well as by inheritance from the public domain, if I may so express it, but they had the plaintiffs' method of developing the basic plot in the Play and in the plaintiffs' Treatment more or less freshly impressed on their minds by the public showing of the Play which they had seen, and from their examination of the manuscript thereof and of the Treatment.

The objective of the defendants' scenario writer was a story that would attract modern audiences. That also had been the objective of the plaintiffs. It would not have been astonishing, therefore, to find, even without access, that the basic plot after passing through the medium of the minds of two sets of modern writers showed that coefficients of refraction substantially alike had been in operation on it, and that the results of that refraction differed mainly in so far as the two sets of minds at work differed in their literary skill in dealing with the dramatic situation inherent in the common subject-matter which they had chosen.

But here we have access, and the defendants, balked in their desire to get the motion picture rights to the Play, obviously wished to

approach it as nearly as they safely could without infringement of its copyright.

The result naturally was that in the Picture we have something which is much more like the Play than it is like the Novel or like the Trial.

X. The basic plot of the Trial, always since 1857 in the public domain, lies, therefore, as the principal obstacle across the plaintiffs' path to a decree in this case.

Without the basic plot and with the Play and Picture alone before me, together with the admitted access we have here, I should say that the plaintiffs might have been entitled to a decree. For the arrangement of the threat scene, the poison scene, and the investigation scene in sequence as they occur in the Play and Picture alike would, under the circumstances of access here shown, be proof that there was a substantial taking of the plaintiffs' arrangement of their literary material. Cf. Daly v. Palmer, 6 Fed. Cas. 1138, Fed. Cas. No. 3552; Curwood v. Affiliated Distributors (D. C.) 283 F. 223, 228; Corelli v. Gray, decided November 20, 1913, by the Court of Appeal in England and reported only in MacGillivray Copyright Cases, 1911–1916, at page 107.

But the basic plot of the Trial destroys this hypothesis. For in the present case the sequence of scenes and, substantially, the content of those scenes so far as the impression on, or emotion caused ·in, the audience or reader is concerned, are all found in the Trial, from which, in this regard, the architectural structure of the Play, the Novel, and the Picture confessedly stems.

This constitutes a fatal dilution of the strength which the plaintiffs' case might otherwise have, and forces them to seek for a basis for claiming literary larceny in details of the Picture.

I am left, therefore, to determine whether there is aught in those details for which I can fairly say the plaintiffs secured protection when they got the copyright of their Play, and which the defendants took when they made their Picture.

■ XI. The common origin of the plot of both Play and Picture in a mid-nineteenth century trial impinges also on the soundness of the test strongly urged on me by the plaintiffs' counsel, i. e., the impression of the Play and the Picture on the "average playgoer" who apparently is sought to be made the analogue in causes involving dramatic copyright of the "reasonable man" in other branches of the law.

In a situation such as I have here, however, I must, as the trier of the facts, have a more Olympian viewpoint than the average playgoer. I must look at the two opposing productions, the Play and the Picture, not only comparatively, but, as it were, genealogically.

■ XII. The mere fact of access, of course, is not fatal to a defense in a copyright case. Dymow v. Bolton, 11 F.(2d) 690, 692.(C. C. A. 2); Nichols v. Universal Pictures Corporation, 45 F.(2d) 119, 120 (C. C. A. 2).

■ Success for the plaintiff in a case where access is admitted or proved depends, as Judge Hough said in the Dymow Case (C. C. A.) 11 F.(2d) at page 692, on whether there was substantial appropriation by the defendant of a copyrighted matter, or, as Judge Learned Hand put it in the Nichols Case (C. C. A.) 45 F.(2d) at page 121, whether the defendant took any more than the law allowed.

■ XIII. Infringement of copyright is a trespass on a private domain owned and occupied by the owner of the copyright, and, therefore, protected by law.

Accuracy in drawing the boundary of this domain, in such a situation as we have here, will be promoted I think, though probably it can never be achieved, by inquiring what copyrightable matter the plaintiffs had protected under the ægis of the copyright law, instead of focusing attention principally on what the defendants did; for the defendants are only legally responsible if they have impinged on the plaintiffs' private domain.

■ The plaintiffs' private domain in their Play included at least: (1) The sequence of language used by them, that is, the dialogue; and (2) their treatment of some of the situations in so far as that treatment may have been original.

■ XIV. On the other hand, however, the plaintiffs' private domain did not include, and, consequently, the plaintiffs did not have, any copyright protection for the structure of the plot of their Play, for that was clearly in the public domain as stemming from the Trial. This was also true of the irregularity of the Heroine's life and of her fear of discovery, both of which seem to be emphasized by the plaintiffs as internal evidence of copying by the defendants.

Family inheritance of vicious characteristics is not protected by copyright, for it has long been in the public domain.

Ideas, of course, are not protected by copyright, and, consequently, the plaintiffs' theme, that is, the basic idea of their Play, would not have been protected, quite irrespective of the fact that it was based on the Trial, which was in the public domain. Nichols·v. Universal Pictures Corporation (C. C. A.) 45 F.(2d) 119, 121.

Obviously, the locale of a plot cannot be protected by copyright. An artist may paint a picture of a landscape for which he can get a copyright, but he cannot copyright the landscape. The same is true, of course, of an author who places his plot in a particular locale.

The so-called sex alibi which led to the acquittal of the Heroine in the Play and to the district attorney's dropping the investigation in the Picture has long been in the public domain, as the books cited and submitted at the trial showed.

The plaintiffs' counsel put great emphasis, as I understand it, both in connection with the so-called external evidence and also in connection with the internal evidence of copying, on some of the stage business and on the dress and appearance of the actors. These aspects of a dramatic composition are not protected by copyright. Serrana v. Jefferson (C. C.) 33 F. 347; Fuller v. Bemis (C. C.) 50 F. 926, 929; Bloom & Hamlin v. Nixon (C. C.) 125 F. 977, 978; Savage v. Hoffman (C. C.) 159 F. 584, 585; Green v. Minzensheimer (C. C.) 177 F. 286; Chappell & Company v. Fields (C. C. A.) 210 F. 864, 865.

And in this connection I might remark that it cannot be doubted that, if Miss Cornell and her leading man in "Dishonored Lady" could have been engaged by the defendants to play in "Letty Lynton" so that the resemblance between the appearances of the characters in the Play and in the Picture would have been perfect, it would not have constituted any breach of the plaintiffs' copyright of the Play.

XV. As a matter of the philosophy of the growth of literature, each book when published is thrown into the common heritage of mankind, and contributes to that heritage its share, be it much or little, of general ideas and suggestions. That is what Judge Learned Hand meant, as I understand it, when he said in the Nichols Case (C. C. A.) 45 F.(2d) 119, at page 122, speaking of Miss Nichols' copyright: "Her copyright did not cover everything that might be drawn from her play; its content went to some extent into the pub-

lic domain. We have to decide how much, and while we are as aware as any one that the line, wherever it is drawn, will seem arbitrary, that is no excuse for not drawing it; it is a question such as courts must answer in nearly all cases. Whatever may be the difficulties a.priori, we have no question on which side of the line this case falls."

Now, it is of the greatest importance to the growth of human knowledge that literature should be free to develop, and, hence, it is that literary property in ideas has never been recognized. Holmes v. Hurst, 174 U. S. 82, 86, 19 S. Ct. 606, 43 L. Ed. 904; Guthrie v. Curlett, 36 F.(2d) 694 (C. C. A. 2); Nichols v. Universal Pictures Corporation, 45 F.(2d) 119, 121 (C. C. A. 2), and cf. Birrell on Literary Larceny quoted in Lewys v. O'Neill (D. C.) 49 F.(2d) 603, at page 607.

A book or play which contains some matter not new or original may be copyrighted because it is an entire thing which, under the statute (17 USCA § 1 et seq.), may not be copied in toto, and the part of it which is original cannot otherwise be protected. But the securing of a copyright is a purely mechanical matter involving the compliance with the statute as to the filing of copies of the work for which copyright is sought.

The Copyright Office does not, when a book is offered for copyright, study any prior art, as does the Patent Office when a patent is sought. It grants the copyright, thus putting the protection of the law not only over the copyrighted book as an entirety, but over the original content of the book. It is then left to the courts, if litigation ensues, to say what that original content is, and to define the zone in which the copyright owner is protected.

In defining that zone it always has to be determined: (1) Whether some part of the zone claimed is not a part of a common ground, the heritage of all mankind, usually referred to as the public domain; or (2) whether some of the infringement claimed is not of matter which is not protected by copyright for some other reason.

Naturally the plaintiff always seeks to widen his protected zone and the defendant to narrow it.

It follows that the approach of a court to the problem of the infringement of a play cannot be purely that of an ordinary playgoer, for such a playgoer presumably has not the opportunity to determine the limits

of the protected zone by the principles above outlined.

In Dymow v. Bolton, 11 F.(2d) 690 (C. C. A. 2), Judge Hough summed up the situation with his characteristic clarity and vigor. Referring to the copyright statute, he there says, at page 691 of 11 F.(2d):

"Just as a patent affords protection only to the means of reducing an inventive idea to practice, so the copyright law protects the means of expressing an idea; and it is as near the whole truth as generalization can usually reach that, if the same idea can be expressed in a plurality of totally different manners, a plurality of copyrights may result, and no infringement will exist.

"If one compares two dramatic compositions, whether in forms suitable for the stage or for the library, what has been called the 'fundamental plot,' the 'same old plot,' or an 'old story,' can assume any author's dressing or adornment; that author can devise and use his own way of expressing that plot, and he will not infringe. This general proposition is illustrated in London v. Biograph Co., 231 F. 696, 145 C. C. A. 582; Eichel v. Marcin (D. C.) 241 F. 404; Stodart v. Mutual Corp. (D. C.) 249 F. 507.

"The theory is (however difficult may be its application at times) 'that the protection accorded the owner of copyright is of the intellectual product of the author.' King, etc., Syndicate v. Fleischer (C. C. A.) 299 F. 533, at page 536."

XVI. The only infringement which the plaintiffs could have successfully claimed in the situation here involved would, therefore, have been substantial copying of their literary embellishments of the public domain material which they had chosen for their structural design.

The plaintiffs' argument limited their claims, in this regard, to the last three scenes of the Picture which I have discussed above. I find that there was not in those scenes any substantial copying of material, not in the public domain, which was added by the plaintiffs to the plot of the Trial.

XVII. I find, therefore, that, whilst the defendants' writers had access to the Play and undoubtedly had it constantly before their minds when they were making the scenario for the Picture, they did not copy anything therein or take anything therefrom which was protected by copyright, and that, as a matter of law, therefore, they did not infringe the plaintiffs' copyright.

Consequently, a decree dismissing the bill of complaint must be granted herein.

XVIII. This opinion may stand as the findings of fact and conclusions of law herein under Equity Rule 70½, 28 USCA § 723, and I will sign an order accordingly, either before the final decree dismissing the case is submitted for settlement, or at the time when that is done. Cf. Lewys v. O'Neill (D. C.) 49 F.(2d) 603, 618.

XIX. Costs and counsel fees in copyright cases are discretionary, Fisher, Inc., v. Dillingham (D. C.) 298 F. 145, and inasmuch as I think the plaintiffs were fully justified in submitting this unusual and very interesting case to judicial arbitrament, I do not grant any costs to the defendants on the dismissal of the complaint.

Settle order on two days' notice.