The **GATES RUBBER COMPANY**, a Colorado corporation, Plaintiff,

v.

**BANDO AMERICAN, INC.**, an Illinois corporation, **Steven R. Piderit**, an individual, **Ron Newman**, an individual, **Denise Hanano**, an individual, and **John Does 1–99**, Defendants.

Civ. A. No. 92–S–136.

United States District Court, D. Colorado.

June 24, 1992.

Order on Motions and Amending Aug. 12, 1992.

Rodger Wilson, Denver, Colo., Karl Dakin, Englewood, Colo., for plaintiff.

James Lowe, Duane Burton, Denver, Colo., Thomas Johnson, Baker & McKenzie, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER GRANTING INJUNCTIVE RELIEF

SPARR, District Judge.

THIS MATTER comes before the Court on Plaintiff's motion for permanent injunction. The issues in this case stem from the traditional conflict in copyright law—how to protect an author's creative expression while preserving competition in the marketplace. This dilemma is nothing new, but the case law and commentators in the area of copyright protection seem woefully ill-equipped to provide a systematic means for analyzing copyright issues as they arise in the context of computer software. Indeed, the heart of copyright law, designed to accommodate unimaginable varieties of creative expression, has mandated resolution of disputes on a case-by-case basis. What magnifies the underlying dilemma, however, is the realization that copyright law was not designed to accommodate computer software protection. With this stated, the Court must nonetheless proceed to resolve the dispute before it.

### Procedural Background

This case was filed by the Plaintiff, Gates Rubber Company, against one of its competitors in the industrial belt market, Bando American, and some of its employees (who also happen to be former Gates employees). Gates currently enjoys the largest market share in the industrial belt manufacturing industry, approximately 38%. The subject of this copyright infringement action, which also contains a claim for misappropriation of trade secrets, is the Plaintiff's computer program known as Design Flex 4.0. This software is designed to aid in the selection of replacement belts for Gates's industrial belt customers. Its primary purpose is as a marketing tool, while its function is to produce multiple drive design (uses in which more than a single belt is required) capability.

The initial hearing in this matter was held on January 28, 1992. After hearing testimony and conferring with counsel, it was determined that a temporary restraining order was not needed at that time, and the motion for temporary restraining order was accordingly denied. The Court further ordered that each party appoint one expert with the experts to agree upon a third independent expert to examine the copyright issues and report back to the Court by February 6, 1992, at which time it was anticipated the preliminary injunction hearing would commence. On February 6, 1992, Plaintiff filed an amended complaint expanding the allegations and parties in the case. It was determined appropriate that the matter be set for permanent injunction hearing to commence on March 26, 1992, at which time the Court would entertain the single issue of whether injunctive relief was appropriate on Plaintiff's claims of copyright infringement by the Defendant Bando's Chauffeur program, and the misappropriation of trade secrets claim. The motion for permanent injunction was filed April 6, 1992. The remaining issues are set for a jury trial, now set to begin in May 1993.

The Defendant corporation Bando American is headed by Mr. Allen Hanano, who presented testimony at the permanent injunction hearing. Mr. Hanano (once employed by Gates Rubber) in turn hired Defendants Newman and Piderit away from Gates.[1] Shortly after the hiring of Defendant Piderit in October 1988, an executable version of the predecessor to the "Chauffeur" program was demonstrated at a convention in Kentucky in June 1989. The

---

[1] Upon termination, Newman and Piderit signed written agreements not to reveal trade secrets and to return all documents, information, and other materials used during their employment at Gates. Mr. Piderit, however, waited some four weeks after accepting the offer of employment from Bando to inform Gates of his decision to seek employment with Bando. This effectively thwarted Plaintiff's policy of asking employees who sought further employment with a competitor of Gates' to immediately clear out of the Gates office.

Plaintiff alleges that the successor to this program is an infringing copy of the Design Flex program.

In arriving at the determination of appropriate size and other dimensions or capacities for replacement belts, the user of Design Flex provides information for use by the program, answering relevant questions which assemble the data necessary for the program to perform its calculations. A central issue of this action concerns in particular the calculation methods. Using published formulas, the Design Flex program employs certain mathematical constants to design a drive and for which to determine belt size. The formulas and constants are the same ones used by Gates engineers when calculations are made manually. One reason the Design Flex, as well as its alleged copy produced by Defendant Bando, the Chauffeur program, is so attractive a marketing tool is that the sales staff, who are otherwise not trained to perform such calculations, can use the program while "in the field" and can determine readily, and usually without the aid of an engineer, the type of belt a customer requires.

With regard to the sale of new industrial belts, Gates uses a program known as "Life in Hours" to determine, among other things, when replacement belts will be necessary. This Life in Hours program is the subject of Plaintiff's misappropriation of trade secrets claim. The determination of the trade secrets issues is found in the final portion of this decision.

This Court has jurisdiction to hear this action pursuant to 28 U.S.C. § 1338. In addition, jurisdiction is appropriate as to the copyright infringement action as the Plaintiff has met the registration requirements of 17 U.S.C. § 411(a). By virtue of this fact, the scope of the remedy available to the Plaintiff for copyright infringement is dictated by the scope of the copyright actually registered. *Cable News Network v. Video Monitoring Services*, 940 F.2d 1471, 1480 (11th Cir.1991). The registra-

tion of Plaintiff's copyright for Design Flex, version 4.0 is before this Court as Plaintiff's exhibit 9.

Statement of the Issues

■ The issues before this Court have been limited for purposes of the permanent injunction hearing to those arising from the alleged copyright infringement of the Plaintiff's Design Flex program, and the injunctive relief sought arising from the Plaintiff's misappropriation of trade secret claim on its Design Flex program. The two primary elements of an infringement action consist of proving ownership of the copyright by the plaintiff and copying of the work by defendant.[2] These two elements will be discussed in turn.

## I. *Prima Facie Case: Ownership and Registration of the Copyright*

To establish copyright infringement, Plaintiff must prove both ownership of a valid copyright in the Design Flex program (which it has done) and copying by the Defendants of the copyrighted work (here the Court examines Bando's program known as "Chauffeur"). *Sid & Marty Krofft Television Products, Inc. v. McDonalds Corp.*, 562 F.2d 1157, 1162 (9th Cir.1977). The Copyright Act [hereafter referred to as "the Act"] at 17 U.S.C. § 102 (1989) states the general requirements of copyright protection:

(a) Copyright protection subsists, in accordance with this title, in original works of authorship fixed in any tangible medium of expression, now known or later developed, from which they can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device. Works of authorship include the following categories:

(1) literary works;

. . . . .

(6) motion pictures and other audiovisual works; and

(b) In no case does copyright protection for an original work of authorship extend

---

**2.** The United States Supreme Court recently refined this approach in *Feist Publications, Inc. v. Rural Telephone Service Co.*, ⸺ U.S. ⸺, 111

S.Ct. 1282, 1296, 113 L.Ed.2d 358 (1991). This case will be discussed in greater detail below.

to any idea, procedure, process, system, method of operation, concept principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work.

The Act defines a computer program as a "set of statements or instructions to be used directly or indirectly in a computer in order to bring about a certain result." 17 U.S.C. § 101 (1989). Many copyright principles applicable to literary works apply with equal force to computer programs. Computer software which is copyrightable can be protected as a literary work. See Kutten, *Computer Software: Protection/Liability/Law/Forms* § 2.02[1][a] at 2–18 (1990). See also *M. Kramer Manuf. Co., Inc. v. Andrews*, 783 F.2d 421, 435–36 (4th Cir.1986). As a literary work, two requirements must be met in order for it to be considered copyrightable: it must be fixed in a tangible medium of expression; and it must be original. See 17 U.S.C. § 102(a). These two elements are not effectively in dispute in this proceeding, as the issues in this dispute involve a much narrower scope of the copyright law—namely, whether there is substantial similarity of protected expression. Plaintiff has alleged that Defendants copied its Design Flex program in producing its Chauffeur program. Copying is a "shorthand reference to the act of infringing any of the copyright owner's five exclusive rights set forth at 17 U.S.C. § 106." *Ford Motor Co. v. Summit Motor Products, Inc.*, 930 F.2d 277, 291 (3d Cir.1991), citing *Paramount Pictures v. Video Broadcasting Systems*, 724 F.Supp. 808, 819 (D.Kan.1989). Defendants assert at least two arguments relevant to this stage of inquiry: that Plaintiff's copyright is not enforceable as it is submitted; and that Plaintiff's claims arising from the infringement of contents of the registration are not capable of recognition in copyright law due to the nature (unprotectable) of the claims.

The Court here has divided the scope of inquiry along the lines suggested by the statute and established case law. As stated above, Plaintiff must show a valid copyright and then must demonstrate evidence of copying (substantial similarity and ac-

cess). However, the Defendants' defenses are based upon the argument that no action or remedy is appropriate here because Plaintiff's program (or elements of the program) is unprotected (due to improper registration, prior publication, entry of material into public domain) and/or it is unprotectable in that the program or its elements are not capable of protection due to their falling outside the realm of protected expression encompassed by the copyright laws. Unfortunately, these defenses do not lend themselves to easy categorization in either of the two prongs of establishing a prima facie case. The Court will address the merits of these defenses below.

It is axiomatic that copyright law does not protect ideas, but only expressions of ideas. *Baker v. Selden*, 101 U.S. (11 Otto) 99, 25 L.Ed. 841 (1879), *Mazer v. Stein*, 347 U.S. 201, 217, 74 S.Ct. 460, 470, 98 L.Ed. 630 (1954). Section 102(b) of the Copyright Act at Title 17 also indicates the idea-expression distinction. The more thorny issue before this Court, however, does not involve a neat dichotomy between idea and expression, but rather a gray area requiring a foray into the scope of what is considered a protectable expression in the context of substantial similarity of two competing computer programs. Before injecting itself into this gray area, the Court must first examine the copyright registration of the work allegedly infringed.

A. Elements of Copyright Registration

Copyright infringement is established if the plaintiff proves that it owned copyrighted material and that the copyrighted material was copied by the defendant. *Masquerade Novelty, Inc. v. Unique Industries, Inc.*, 912 F.2d 663, 667 (3d Cir. 1990). Ownership of the copyright can in turn be broken down into constituent parts: (1) originality in the author; (2) copyrightability of the subject matter; (3) citizenship status of the author such as to permit a claim of copyright; (4) compliance with applicable statutory formalities; and (5) (if the plaintiff is not the author) a transfer of rights or other relationship between author and plaintiff so as to constitute the plain-

tiff the valid copyright claimant. Melville Nimmer and David Nimmer, 3 *Nimmer on Copyright* § 13.01[A] at 13–5—13–6 [hereafter Nimmer] (1991) (citations omitted). Of particular import in this proceeding are the second and fourth elements.

### 1. *Presumption of Ownership of Copyright*

■ Pursuant to 17 U.S.C. § 410(c), certificates of copyright constitute prima facie evidence of the validity of plaintiff's copyright and establish that the holder of the copyright is entitled to the attendant legal protection. *Williams Electronics, Inc. v. Artic International, Inc.*, 685 F.2d 870, 873 (3d Cir.1982). See also *Seiler v. Lucasfilm, Ltd.*, 808 F.2d 1316, 1321 (9th Cir. 1986), *cert. denied*, 484 U.S. 826, 108 S.Ct. 92, 98 L.Ed.2d 53 (1987). Plaintiff has submitted its registration of copyright, and accordingly there is a presumption that the copyright is valid and that the Plaintiff is entitled to the protection afforded by the law. *Johnson Controls v. Phoenix Control Systems*, 886 F.2d 1173, 1175 (9th Cir. 1989). See also *Nintendo of America v. Elcon Industries, Inc.*, 564 F.Supp. 937, 943 (E.D.Mich.1982); *Durham Industries, Inc. v. Tomy Corp.*, 630 F.2d 905, 908 (2d Cir.1980).

■ Once the presumption of ownership is established, defendant has the burden of overcoming it. *Williams Electronics*, 685 F.2d at 873, citing *Flick–Reedy Corp. v. Hydro–Line Manufacturing Co.*, 351 F.2d 546, 549 (7th Cir.1965), *cert. denied*, 383 U.S. 958, 86 S.Ct. 1222, 16 L.Ed.2d 301 (1966). Once the presumption of ownership is raised and successfully established, plaintiff must then establish that defendant copied its protected work.

### B. Analysis of the Design Flex 4.0 Copyright Registration

In its rebuttal case, the Defendants sought to show in particular that Plaintiff failed to follow applicable statutory formalities, and urged the Court to hold that the copyright registration of the Design Flex 4.0 program is void or of only very limited extent. A discussion of the applicable rules as applied in the Design Flex registration is thus necessary. Defendants have disputed the validity of the Plaintiff's registration. In their presentation of rebuttal, Defendants offered the testimony of G. Gervaise Davis, Esq. as an expert in copyright law, industry practice concerning copyright protection, as well as trade secrets issues. In response to this testimony, Plaintiff offered the testimony of Christopher Meyer, Esq. The testimony of these two attorney experts raises several issues pertaining to the validity of the registration, and these will be dealt with in turn.

As noted above, Defendants have attacked in particular the copyrightability of the subject matter of the copyright as well as Plaintiff's compliance with the applicable statutory formalities. The latter issue will be discussed first. Although the Defendants' proposed findings and conclusions on this issue are somewhat vague as to their particular allegations regarding the invalidity of the registration, the Court will discuss the elements of statutory compliance as they relate particularly to this program, as well as address issues concerning publication, derivative works, and materials dedicated to the public domain. The gist of Defendants' argument here appears to be that because Plaintiff failed to comply with a "duty of candor" in disclosing certain facts to the Copyright Office, the registration should be stricken as it intentionally withheld material information from the Copyright Office. The law cited by the Defendants in support of their contention is inapposite or distinguishable from the facts relevant to this action. See Defendants' proposed findings and conclusions at 64–69. The factual premises upon which these legal arguments are made are vague and confusing. The Court will examine each relevant portion of the copyright registration in turn. Defendants seek to have this Court hold the Plaintiff's copyright registration a nullity due to Plaintiff's fraud on the Copyright Office, misrepresentation of material facts in the registration form, and its failure to fulfill the duty of candor toward the Copyright Office.

Issues arising from the copyright registration can be resolved by examining the issues of whether a publication took place (and if so, what type of publication) as well as whether Design Flex 4.0 is a "derivative work" based in substantial part upon preceding versions.

1. *Whether Previous Versions of Design Flex 4.0 Were Published*

█ It can be said that "publication occurs when by consent of the copyright owner, the original or tangible copies of a work are sold, leased, loaned, given away, or otherwise made available to the general public ..." 1 Nimmer, § 4.04 at 4–18 (1990) (citations omitted). Defendants have argued that, as a result of some copies of Design Flex being made available to customers or distributors of the Plaintiff, it has effectively published a version of its Design Flex program. (Citation to exhibit.) There is little dispute that Plaintiff did not intend the publication of the Design Flex program, but this fact is not of substantial import standing alone. See 1 Nimmer, § 4.13[D] at 4–77 (1991) and authorities listed. It is undisputed that a large number of Gates's customers and distributors have seen the running of the Design Flex program. Even if this is termed a public performance which makes the program public, there is little doubt that such performance does not amount to a publication under § 101 of the Copyright Act. See 1 Nimmer § 4.08[A] at 4–43 (1990). Any "publication" resulting from Gates's use of the Design Flex program as part of its marketing strategy can be termed a limited publication. The only evidence (a letter) to which the Defendants could point for the proposition that Design Flex has been published, or otherwise dedicated to the public domain, was very general in nature, and Plaintiff presented credible testimony by Mr. Shepherd that this letter was of limited impact. There appears to have been a company-wide policy of communicating to customers and distributors with the use of Design Flex but with the limitation that its use was for the selection of Gates's belts and that the program was proprietary to Gates.

In addition, the Court finds compelling Mr. Meyer's conclusion that there is no need to refer to previous versions of Design Flex in the TX form, as these spaces need only be filled out where the title of a previously published work changes. (Referring to Plaintiff's exhibit 176 at § 613.-07.) As a result of these factors—in particular that there was no prior publication, the Court must conclude that, if any publication occurred, it was a limited publication, which communicated the content of the program to a definitely selected group for a limited purpose, without the right of diffusion, reproduction, distribution, or sale. 1 Nimmer § 4.13 at 4–68 (1991). Plaintiff was thus not bound by the notice provisions of § 405 of the Act. See *Intown Enterprises, Inc. v. Barnes*, 721 F.Supp. 1263, 1266 (N.D.Ga.1989).[3]

2. *Whether Design Flex 4.0 Is a Derivative Work*

█ The subject matter of copyright law includes derivative works. 17 U.S.C. § 101 defines a derivative work as

> a work based upon one or more preexisting works, such as a translation, musical arrangement, dramatization, fictionalization, motion picture version, sound recording, art reproduction, abridgment, condensation, or any other form in which a work may be recast, transformed, or adapted. A work consisting of editorial revisions, annotations, elaborations, or other modifications which, as a whole, represent an original work of authorship, is a 'derivative work.'

In this context, the Defendants argue that the general rule that publication of a derivative work constitutes publication of the basic work would apply, and as a result, the publication of previous (unspecified) versions of Design Flex 4.0 present only in the most current changes, the features including the local area network and

---

**3.** This would also be true in the situation described in 2 Nimmer § 7.13[B] at 7–118–121 (1991).

an energy saving calculation to be protected by copyright. Nimmer notes the dearth of case law on this particular issue, but states that "it would seem that any authorized publication of a derivative work must necessarily also constitute a publication of the preexisting work upon which it is based." 1 Nimmer § 4.12[A] at 4–57 (1990). However, the conclusion in the previous section above prevents any of these consequences because the Court has already determined there was no publication—authorized or not—of any 4.0 predecessor works. As a result, there can be no "revival" of the pre-existing work which previously entered the public domain. See 2 Nimmer § 7.12[C][2] at 7–100–100.1 (1991).

Defendants also seek to have this Court disregard the Plaintiff's registration due to its failure to refer to any "derivative works" in the TX form. Implicit in the analysis of what comprises a derivative work is an assumption that the previous works were published or subject to copyright registration. This is especially apparent concerning ownership issues in creating derivative works, in situations where copyright owners of derivative works and the underlying work may be different persons or entities.

Defendants have cited no persuasive authority for the argument that the Court should disallow Plaintiff's copyright registration based upon a failure to disclose previous unpublished works or versions of the Design Flex program. Any "duty of candor" to the Copyright Office which Defendants seek to have recognized by this Court is far too undeveloped and speculative and would likely not be appropriate in light of the facts of this case. This Court has found no misuse of copyright, nor does it find application of the equitable doctrine of unclean hands appropriate in these circumstances to disallow Plaintiff's enforcement of its copyright. See *QAD. Inc. v. ALN Associates, Inc.*, 770 F.Supp. 1261 (N.D.Ill.1991). The Court also does not find forfeiture of the copyright appropriate on other grounds. See, e.g., *M. Kramer*

*Mfg. Co., Inc. v. Andrews*, 783 F.2d 421 (4th Cir.1986). Grounds for cancellation of the copyright by the Copyright Office, as set forth in 37 C.F.R. § 201.7 (1991), are also of little significance to the facts and issues here.

In conclusion, the Plaintiff has sustained its burden of showing the first element of a prima facie case by establishing that it owns an enforceable copyright in Design Flex 4.0. With regard to the expert testimony submitted on copyright law and industry practice (before the Copyright Office),[4] the Court will limit its comments to the following. The testimony of Defendants' expert, Mr. G. Gervaise Davis, was of minimal assistance to this Court. Although Mr. Davis is undoubtedly very qualified to testify in this area, his testimony regarding the issues in this case can be termed conclusory. Mr. Davis freely used terms such as "distribute," "publish," and "intentional misrepresentation," with little or no adequate explanation. For example, Mr. Davis declined the opportunity to explain his conclusion on cross-examination that Design Flex 4.0 is a derivative program which incorporates a substantial amount of already published material.

The Plaintiff's rebuttal expert was Mr. Christopher Meyer. The Court found his testimony, in addition to being well-informed, informative, clearly and painstakingly explained, and very helpful. Mr. Meyer's testimony, which he often linked to helpful authorities, tended to explain away many of Mr. Davis's conclusions, supplanting them with well-reasoned observations and opinions applied to appropriate facts. As the presumption going to the validity of the copyright has not been rebutted by presentation of evidence of the invalidity of the copyright, see *Gardenia Flowers, Inc. v. Joseph Markovitz, Inc.*, 280 F.Supp. 776 (S.D.N.Y.1968), the Court reiterates its conclusion that Plaintiff has established the first prong of its prima facie case. Discussion will now proceed to the more troublesome area of determining whether there is substantial similarity between the two programs.

---

**4.** The preemption issues regarding trade secrets will be discussed below.

*II. Prima Facie Case: Copying*

It is axiomatic that copyright law protects only against copying and not against similarity *per se*.[5] In this respect, the Court will examine first the issue of Defendants' access to the Design Flex program, and then whether there exists either direct or circumstantial proof of copying. The examination of the latter proof entails application of the substantial similarity test. In turn, the Court will also examine independent development.

A. Proof of Access by Defendants to Plaintiff's Design Flex Program

■ The role of access in determining whether there has been copying seems to occupy an important position in relation to the substantial similarity test, but this has not always been clearly expressed in the applicable case law. Access is but one inference which may lead to a conclusion of copying. Once this inference is established, it may tend in turn to strengthen an inference of copying based on substantial similarity. At the same time, where a court finds no substantial similarity, it may conclude that any discussion of the access issue is irrelevant because the substantial similarity tends to be the determinative factor. This Court will discuss the access issue before considering the substantial similarity element of copying.

■ One element of proof regarding inferential proof of copying is a showing that defendant had access to the allegedly infringed copyrighted work. Sometimes this element precedes analysis of substantial similarity, as in *Whelan Associates, Inc. v. Jaslow Dental Laboratory, Inc.*, 797 F.2d 1222, 1231–32 (3d Cir.1986) *cert. denied*, 479 U.S. 1031, 107 S.Ct. 877, 93 L.Ed.2d 831 (1987) [hereafter *Whelan* ], while other times it may follow such analysis. *Data East USA, Inc. v. Epyx, Inc.*, 862 F.2d 204, 206 (9th Cir.1988) [hereafter *Data East* ]. Access can be defined as "the opportunity to view or to copy" the plaintiff's work. *Computer Associates International, Inc. v. Altai, Inc.*, 775 F.Supp. 544, 558 (E.D.N.Y.1991), citing *Sid & Marty Krofft Television Productions*, 562 F.2d at 1172. Some courts have held that where the similarity between plaintiff's and defendant's work is sufficiently striking and substantial, the trier of fact may be permitted to infer copying notwithstanding the plaintiff's failure to prove access. See 3 Nimmer, § 13.02[B] at 13–17 (1990), and cases cited.

■ As it is rarely possible to prove copying through direct evidence, *Roth Greeting Cards v. United Card Co.*, 429 F.2d 1106, 1110 (9th Cir.1970), copying may be proved inferentially by showing that the defendant had access to the allegedly infringed copyrighted work and that the allegedly infringing work is substantially similar to the copyrighted work. *Ferguson v. National Broadcasting Company*, 584 F.2d 111, 113 (5th Cir.1978). Access is a highly relevant issue in this case, as the purported author of Defendant Bando's program was a former employee of Gates, who, over the course of over seven years, regularly used the Plaintiff's computer programs including Design Flex.

■ The access issue here is not in itself determinative, but is corroborative of the copying elements of the substantial similarity test. All of the individual Defendants are former employees of the Plaintiff, and in particular, Defendant Piderit, who claims to be the sole author of the Defendant Bando's Chauffeur program, had access to the program and its components including the source and object codes.

The testimony of Mr. Ralph Hamilton was of assistance with regard to this issue. Hamilton is presently an employee of Gates, although his position appears to be somewhat tenuous for reasons which became clear during his testimony. He

**5.** The classic statement of this is written by Judge Learned Hand in *Sheldon v. Metro–Goldwyn Pictures Corp.*, 81 F.2d 49, 54 (2d Cir.) *cert. denied*, 298 U.S. 669, 56 S.Ct. 835, 80 L.Ed. 1392 (1936): "[I]f by some magic a man who had never known it were to compose anew Keats's Ode on a Grecian Urn, he would be an 'author;' and if he copyrighted it, another might not copy that poem, though they might of course copy Keats's."

works as a computer programmer at Gates, and had a working as well as a personal relationship with Defendant Newman.[6] After Newman left Gates's employ, Hamilton visited Newman at the Bando office on several occasions. Hamilton testified that he observed the Life in Hours program running on the Bando computer initially in late 1987, and at three other times after that, both before and after Piderit left Gates's employ.[7] Hamilton also testified that he was told by Newman that Piderit brought with him to Bando all the computer files he could "get his hands on" before leaving Gates. Hamilton testified that some time after Piderit was hired, Allen Hanano, President of Bando American, Inc., determined it would not be a good idea for Hamilton to visit the Bando office again. Finally, when presented with a diskette which had been labeled the "original" by the Defendants, which purported to be the diskette which Hamilton had given to Newman with the Life in Hours and other programs on it, Hamilton testified, contrary to the representations by the Defendants' counsel, that it was not the original diskette he had given to Newman. At the hearing, further confusion was created when it was determined that counsel for the Defendants had been advised of the erasure of some of the files from diskettes and/or hard drives.[8]

There is more than ample evidence to support the inference that Piderit (and perhaps others) had access to the Design Flex program. Because the access element corroborates the substantial similarity of the two programs, this Court need not concern itself with the precise weight to be afforded access with regard to the two-pronged substantial similarity test. See, e.g., *Aldon Accessories Ltd. v. Spiegel, Inc.*, 738 F.2d 548, 553–54 (2d Cir.), *cert. denied*, 469 U.S. 982, 105 S.Ct. 387, 83 L.Ed.2d 321 (1984).

### B. Identifying Substantial Similarity

Source and object codes, the literal components of a program, are consistently held protected by a copyright on the program. *Johnson Controls*, 886 F.2d at 1175, *citing CMS Software Design System, Inc. v. Information Designs, Inc.*, 785 F.2d 1246, 1249 (5th Cir.1986) (source code); *Apple Computer, Inc. v. Formula International, Inc.*, 725 F.2d 521 (9th Cir.1984) (object code). See also, *Whelan*, 797 F.2d at 1233, citing *Stern Electronics, Inc. v. Kaufman*, 669 F.2d 852, 855 n. 3 (2d Cir. 1982) (source code); *Apple Computer, Inc. v. Franklin Computer Corp.*, 714 F.2d 1240, 1246–47 (3d Cir.1983) (source and object code), *cert. dismissed*, 464 U.S. 1033, 104 S.Ct. 690, 79 L.Ed.2d 158 (1984); *Williams Electronics, Inc. v. Artic International Inc.*, 685 F.2d 870, 876–77 (3d Cir.1982) (object code). This "first generation" of cases, holding that literal manifestations of computer programs are copyrightable is, in contrast to subsequent cases, relatively uncontroversial. In *Whelan*, the Third Circuit also extended protection to the "non-literal" aspects of a computer program, including its structure, sequence, and organization. *Whelan*, 797 F.2d at 1237–38.

Where there is no direct evidence of literal copying, circumstantial evidence of access to the copyrighted work and substantial similarity between the copyrighted work and the alleged infringing work are examined. *Frybarger v. International Business Machines Corp.*, 812 F.2d 525, 529 (9th Cir.1987). The generally accepted two-pronged test for analyzing substantial similarity is known in a variety of forms and variations. In *Whelan*, 797 F.2d at 1232, the Third Circuit identified the two prongs as the extrinsic and intrinsic tests. For the extrinsic test, the fact-

---

**6.** A diskette with certain computer files was apparently given to Newman by Hamilton while both were still employed by the Plaintiff.

**7.** On cross-examination, Hamilton stated that he had seen the Life in Hours program running on the hard drive of the Bando computer after Defendant Piderit's arrival

**8.** Plaintiff presented testimony at the hearing of Robert Voorhees, who commented on some of his results from running the Norton's Utilities program to determine whether files had been erased from disks.

finder must decide whether there is sufficient similarity between the two works in question to conclude the alleged infringer used the copyrighted work in making his own. If this decision results in the affirmative, the fact-finder then applies the intrinsic test, where, with the perspective of a "lay observer" and without expert testimony, it determines whether the copying was "illicit" or an "unlawful appropriation." *Id.*, citing *Arnstein v. Porter*, 154 F.2d 464, 468–69 (2d Cir.1946); and *Universal Athletic Sales Co. v. Salkeld*, 511 F.2d 904, 907 (3d Cir.1975). In *Dawson v. Hinshaw Music, Inc.*, 905 F.2d 731 (4th Cir. 1990) [hereafter *Dawson*], a copyright infringement case involving similarity of sheet music, the Fourth Circuit recalled the two prongs of the substantial similarity inquiry, noting that a plaintiff must establish substantial similarity of both the ideas of the two works and of the expression of those ideas. The *Dawson* court observed the variety of labels for the two-prong inquiry, but concluded that the difference in labels (not the nature of the tests) need not concern it. 905 F.2d at 732, n. 1.

The genesis of the substantial similarity test can be traced back to Judge Learned Hand's opinion in *Nichols v. Universal Pictures Corp.*, 45 F.2d 119 (2d Cir.1930), *cert. denied*, 282 U.S. 902, 51 S.Ct. 216, 75 L.Ed. 795 (1931). See Comment, *Litigation as a Mechanism for Inefficiency in Software Copyright Law*, 39 U.C.L.A.L.Rev. 397, 410–11 (1991). The levels of abstraction analysis found in *Nichols* also coexists with the idea-expression distinction first announced in *Baker v. Selden*, 101 U.S. 99, 25 L.Ed. 841. Sometimes, however, the idea-expression distinction is somewhat diluted in analysis applied in infringement cases concerning computer programs. The precise difficulty lies in the necessity of applying the idea-expression distinction on a case-by-case basis. *Whelan*, 797 F.2d at 1235, citing *Peter Pan Fabrics, Inc. v. Martin Weiner Corp.*, 274 F.2d 487, 489 (2d Cir.1960).

While the issue of whether there has been an infringement, the second prong of the substantial similarity test (infringement of protected expression), is made properly on a case-by-case basis, what typically also occurs in the case law analysis is that the determination of what is protectable (the first prong of substantial similarity) is also undertaken on a case-by-case basis, often with little attention given to the distinction between determining what is protected and what is an infringement.

## C. Considering Protectable Expression

Before undertaking an examination and application of the substantial similarity test, it is useful for the Court to examine first the scope of protectable expression in the components of the Design Flex program. It is axiomatic that copyright protects only an author's expression of an idea, not the idea itself. *Mazer v. Stein*, 347 U.S. at 217–18, 74 S.Ct. at 470–71. In considering the experts' testimony in examining substantial similarity, this Court will first consider the whole package of information, and will afterward consider eliminating unprotectable expression. In considering the protectable elements of a program, (in anticipation of applying the substantial similarity test) the Court comes up against the first of a series of dilemmas created by the lack of clarity of this area of the law—copyright protection of computer programs. The Court is presented with at least three possible approaches to setting the background for conducting the substantial similarity test.

It would be convenient to neatly categorize the outcomes of many cases, which come later and address other (nonliteral) aspects of computer programs along "ideological" lines, as at least partly dictated by how closely one believes copyright protection of other literary works corresponds with the protections afforded computer programs—however this is not possible. See Clapes, Lynch & Steinberg, *Silicon Epics and Binary Bards: Determining the Proper Scope of Copyright Protection for Computer Programs*, 34 U.C.L.A.L.Rev. 1493, 1586 (1987). Unfortunately, the nature of the analysis properly being on a case-by-case basis, the many determinations have led to a proliferation of different descriptive terms associated

with particular holdings which have generated more heat than light.

Before exploring the vast landscape of possible "tests" [9] for substantial similarity which could be used here, it is noted at the outset that in determining whether substantial similarity exists, it is exceedingly difficult to determine how, if at all, certain "unprotectable" elements of a computer program should be excluded altogether before any substantial similarity test is undertaken. While the Supreme Court in *Feist Publications, Inc. v. Rural Telephone Service Co.,* —— U.S. ——, 111 S.Ct. 1282, 1288–90, 113 L.Ed.2d 358 (1991) has recently stated that even if the defendant has copied from the plaintiff's copyrighted work, if the only material it has copied are those elements of plaintiff's work which are not protectable, then the resulting copy will not constitute an infringement. While this pronouncement is reasonably clear as to fact-based compilations such as telephone books, there is little indication as to how this is to be incorporated into a substantial similarity test applying to computer programs. While it is axiomatic that in such cases, infringement can be based only on substantial similarity of protectable or protected expression, it seems only reasonable that such expression is excluded only after the substantial similarity test has been undertaken, *i.e.*, after the experts have given their opinions on the relevant elements of the program. This procedure, dating back at least to the *Whelan* decision, has been criticized most recently in the *Altai* case. However, between these two decisions there is little satisfactory middle ground. This Court must rely heavily on the expert opinions of the selected expert witnesses, Drs. Clancey, Davis, and Dorn to determine whether similarities exist as to particular portions of the programs. These opinions are essentially linked with fact findings on the substantial similarity issue. This Court is of the opinion that it is far preferable, especially in an

area of legal and technological sophistication as complex as this area of copyright protection, to draw upon a larger arsenal of facts in order to design or derive the appropriate legally significant facts. Once these are gathered and expert testimony is heard, the court can then analyze which portions of the program, according to the expert testimony, infringes the protected expression.

This Court must conclude that Design Flex is a computer program, not merely an "automated catalog" or otherwise a fact-based compilation. The Design Flex program is far more complex than a fact-based compilation. This is clarified well by the nature and extent of the expert testimony on the program and its components. The fact that the program may contain some scientific "facts" does not render it a fact-based compilation. For this reason, this Court will not consider further the particular case law applicable to fact-based compilations.

The debate concerning the idea-expression dichotomy has developed substantially in recent years in the context of computer software. The debate as it concerns the test for substantial similarity has also addressed which elements are properly considered in analyzing programs for substantial similarity. This copyright protection extends beyond the (object or source) code and concerns itself with the "look and feel" of the program, or its nonliteral elements. Perhaps the first statement of this approach can be found in *Whelan,* 797 F.2d 1222. See also *Pearl Systems, Inc. v. Competition Electronics, Inc.,* 8 U.S.P.Q.2d 1520, 1988 WL 146047 (S.D.Fla. 1988); *SAS Institute, Inc. v. S & H Computer Systems, Inc.,* 605 F.Supp. 816 (M.D.Tenn.1985). This total "look and feel" approach, coming as it does from a branch of copyright law having little to do with computer issues, has been subject to much criticism.[10]

---

9. The tests found under the substantial similarity rubric are numerous and varied. Some of these include the idea-expression distinction, the abstractions test, the ordinary lay observer test, intrinsic and extrinsic tests, look and feel, total

concept and feel, and issues such as functionality, scènes à faire, and the merger doctrine.

10. In two different cases, the Ninth Circuit has held that, absent literal copying, an infringement existed where the "total look and feel" was

### 1. *The Whelan Approach*

This decision caused quite a stir in its holding that certain nonliteral portions of a computer program were the proper subject of protection of the copyright laws. This case concerned a computer program designed to assist in the billing, inventory, and other functions related to the running of a dental prosthetics laboratory. In arriving at its now controversial version of the substantial similarity test, the *Whelan* court examined *Arnstein v. Porter*, 154 F.2d 464 (2d Cir.1946) and its bifurcated extrinsic-intrinsic test, and modified it in favor of the adoption of a "single substantial similarity inquiry according to which both lay and expert testimony would be admissible." 797 F.2d at 1233 (citations omitted).

### 2. *The Altai/Nimmer Approach*

This approach, as articulated in *Computer Associates International, Inc. v. Altai, Inc.*, 775 F.Supp. 544, declines application of the broad view of copyrightability of computer programs announced in *Whelan*.[11] The *Altai* case rejects the *Whelan* decision, which it views as holding the overall structure of a computer program is part of the expression, not the idea of a program, and characterizes the ruling as "inadequate and inaccurate." 775 F.Supp. at 559. This criticism is followed by support from Nimmer: "The crucial flaw in this reasoning is that it assumes that only one 'idea,' in copyright law terms, underlies any computer program, and that once a separable idea can be identified, everything else must be expression." *Id.*, citing 3 Nimmer at § 13.03[F] at 13–62.34.

In the copyright analysis of the *Altai* case, the court considered the operating systems as well as the interfaces (compatibility components) of two computer programs. The defendant's program was a rewritten version of a program that was originally copied from part of plaintiff's

program. 775 F.Supp. at 552–53. Defendant undertook to rewrite its program after it learned that it was copied from plaintiff's program. The rewriting process involved all of defendant's programmers except for the one who was responsible for copying the first program. *Id.* at 554. The court considered only the rewritten version in the comparison to the plaintiff's program.

The *Altai* court, frequently citing the comments of Dr. Randall Davis, (also an expert witness in the present case) rejected *Whelan* for reasons which include the irrelevance of "order" as to subroutines of a program and the overbroadness of "structure" as it includes both text and behavior. The test favored by the *Altai* court considers viewing a program not only as text, but also as behavior. *Id.* This distinction is further elaborated by the characterization of viewing text as the static structure of a program, while the behavior is viewed as dynamic (how the program behaves or responds to particular instruction given by the user). These distinctions were preferred by the court, and also from the opinion of Dr. Davis, to the *Whelan* vagaries of "structure, sequence and organization." The court then made a further legal distinction, beyond Dr. Davis's analysis that "the behavior aspect of a computer program falls within the statutory terms 'process,' 'system,' and 'method of operation,' it may be excluded by statute from copyright protection." *Id.* at 560. The *Altai* court thus focused its attention on the programs as text, considering the source and object codes. Consequently, only that structure which is text and not behavior is protected by copyright. The rather blunt instrument presented in the *Whelan* analysis was disregarded in favor of the "abstractions test," first applied by Judge Learned Hand in *Nichols v. Universal Pictures*, 45 F.2d 119,121 (2d Cir.1930), *cert. denied*, 282 U.S. 902, 51 S.Ct. 216, 75 L.Ed.

---

the same. *Roth Greeting Cards v. United Card Co.*, 429 F.2d 1106 (9th Cir.1970) (greeting cards); and *Sid & Marty Krofft Television Productions, Inc. v. McDonalds Corp.*, 562 F.2d 1157 (9th Cir.1977) (McDonaldland characters similar to H.R. Pufnstuf characters).

11. One of the apparent bases for the departure from *Whelan* seems to be the opinion of Dr. Davis regarding the lack of specificity as to the elements of the *Whelan* test. This Court will not second guess Dr. Davis' understanding of the *Whelan* holding in the *Altai* case.

795 (1931), which Nimmer suggests as an alternative to the *Whelan* test.

Professor Nimmer notes the shortcomings in the *Whelan* method of analysis and prefers the "abstractions test" in aiding the court to systematically separate ideas from expression. He notes, however, that "applying this test conscientiously and systematically can help a court separate ideas from expression and eliminate from the substantial similarity analysis those portions of a work that are not eligible for copyright protection." 3 Nimmer § 13.-03[F] at 13–78.33 (1991). Nimmer identifies the central flaw in the *Whelan* reasoning as its assumption that only one "idea" (in copyright law terms) underlies any computer program, and that once a separable idea can be identified everything else must be expression. The *Altai* test thus rejects any consideration of the *Whelan* factors, proposing not only different component elements to be examined (text and behavior) but also a different analysis of those elements (the abstractions test). However, this rather extreme alternative may be rendered unimportant if the abstractions test is used as a prelude to, instead of as a substitution for, the substantial similarity test identified with *Whelan*. It would also seem that, in light of these criticisms, the *Whelan* test could be reformed so as to not encompass such an inclusive definition of what is an idea.

### 3. *The Dawson v. Hinshaw Modification*

This approach, articulated in *Dawson v. Hinshaw Music, Inc.*, 905 F.2d 731 (4th Cir.1990), is a modification of the two-pronged substantial similarity test. In this case involving a copyright infringement claim on a musical arrangement, the Fourth Circuit held that the second prong of the analysis, variously identified as the intrinsic or subjective test, inquiring into the "total concept and feel" of a work from the standpoint of an ordinary lay observer, should be modified to reflect a particular type of observer when the nature of the

material examined so dictated. In the decision, both *Whelan* and Nimmer are cited in support of the logic dictating the adjustment of the second prong. 905 F.2d at 735–36. The *Dawson* court held that

[w]hen conducting the second prong of the substantial similarity inquiry, a district court must consider the nature of the intended audience of the plaintiff's work. If, as will most often be the case, the lay public fairly represents the intended audience, the court should apply the lay observer formulation of the ordinary observer test. However, if the intended audience is more narrow in that it possesses specialized expertise, relevant to the purchasing decision, that lay people would lack, the court's inquiry should focus on whether a member of the intended audience would find the two works to be substantially similar.

905 F.2d at 736.

The Fourth Circuit remanded the case with the instruction that the district court judge determine whether the definition of a distinct audience was appropriate in the case. The apparent reason for this modification's existence can be attributed to the problem identified in *Whelan*, that the ordinary observer aspect of the substantial similarity test was not appropriate for a complex computer program, and that under such a test, the fact-finder would have to forget all of that expert testimony brought out in the extrinsic test.[12]

### 4. *Protection of Computer Software and Application of the Substantial Similarity Test*

In the circumstances of this case, the Court will apply a substantial similarity test which will be comprised of the "standard" elements of the substantial similarity test. This will entail an examination not unlike that described by the Fourth Circuit in *Dawson*. Because the Court appreciates the importance and technical nature of the expert testimony here, it will give substan-

---

**12.** This test was apparently applied in *Runstadler Studios, Inc. v. MCM Ltd. Partnership,* 768 F.Supp. 1292 (N.D.Ill.1991). That action concerned a copyright on a spiral glass sculpture, and in its analysis of the total look and feel, the court noted that "no one testified that a discriminating observer, giving more than distant and casual attention to the spiral, would confuse one for the other." *Id.* at 1298.

tially greater weight to the extrinsic prong of the two-step test. The second prong of this test will be limited dramatically. The purpose of expert testimony here is to aid the finder of fact in arriving at a determination of whether substantial similarity exists. In the computer software context, this testimony is critical because of the highly technical nature of computer programs and their components. At the same time, this highly technical expert testimony, factual in nature, is to be reconciled with the very broad principles of copyright law. This Court is aware of the difficulties in the relationship between these two factual and legal determinations and will attempt to keep them separate as far as practicable. Finally, to ensure that the substantial similarity test, and in particular the two-pronged test, does not allow for the protection of any unprotectable ideas, the Court will lastly consider the "abstractions" test. This latter test is an important one which can appropriately be considered by the Court at this stage because it will have already considered the expert testimony regarding what portions of the program are similar. At that point it is helpful, once the factual considerations by the experts are taken into account, to consider as a matter of law, which portions of the program are properly protectable.

### a. The Extrinsic or Objective Test

#### i. Testimony of William Clancey, Ph.D.

Dr. Clancey was selected by the other two experts as the independent expert. He signed on Dr. Davis's (Davis testified as the Plaintiff's expert) report, and noted the use of the same formulas and constants in both programs as evidence of copying. He also concluded there was substantial similarity in the overall behavior of the programs, but that the similarities in misbehavior is weak evidence of similarity. With regard to his conclusions, Dr. Clancey noted six different relevant considerations he felt were important: the identity of the programmer; whether the material was unpublished; the relationship between concepts and constants; the population of similar programs in the world; the derivability of portions of the program; and the range,

space and alternative designs. He identified no literal copying of the source or object code. Dr. Clancey also noted that the flow of control in the programs is similar to a certain extent, and that the input and output screens, in the consideration of information requested and the resulting function of the information, were also similar (here he relied on Drs. Davis and Dorn for these observations). The letter from Dr. Clancey to Defendant's counsel, Mr. Lowe, submitted as Plaintiff's exhibit 3, contains specific details regarding Clancey's disagreement with Dr. Dorn.

Perhaps the most valuable portion of Dr. Clancey's testimony comparing the two programs was an analogy he made to paper cups. In this analogy, Dr. Clancey attached significance to how other paper cups would compare to the particular one under scrutiny (referring to whether the Chauffeur program was the only one or was one of many programs which could be considered "competitors" of Gates). He pointed to the importance of first examining the universe of all existing programs which perform functions similar to those of the Design Flex and Chauffeur programs, so that a more precise analysis of similarities could be made, taking into account whether other such similar programs existed, and if so, how their features, perhaps dictated by their function, were similar to those of the two programs under consideration.

#### ii. Testimony of Randall Davis, Ph.D.

Dr. Davis was selected as the Plaintiff's expert witness. Dr. Davis examined extensively several portions of the program. In his comparison of the two programs, Dr. Davis noted four particular points in concluding that the two programs were substantially similar: arrangement, the types of choices available and their presentation; data flow, which he described as being analogous to "recipe;" control flow, which is the sequence of events; and the sequence, which is the sequence of behaviors and internal functions. Davis opined that the author of the Chauffeur program had access to Design Flex, and also that many

of the unique details in Design Flex are replicated in the Chauffeur program, to such an extent for Davis to conclude that if two of his students were to produce two such programs, he would consider it cheating. Dr. Davis concluded that there is no alternative to the conclusion of copying to explain the similarity of the constants, the install files, as well as the overall data flow and presentation.

Dr. Davis also examined the deposition of Defendant Piderit, and in his testimony stated that he found it extraordinary that Defendant Piderit could "sit down and compose" a computer program eight thousand lines in length. Davis used the same adjective regarding Piderit's statements that he independently developed the constants which play such a critical role in the program. In cross-examination one argument advanced by Defendants figured prominently: the Chauffeur program was such an improvement over the Design Flex program that it bore little resemblance to Design Flex except in unavoidable ways, but that Chauffeur was not such a masterpiece as to preclude a programming novice like Defendant Piderit from writing it. Dr. Davis noted that Defendant Piderit seemed unfamiliar with some of the techniques which he employed in the Chauffeur program. In his testimony on the witness stand, Defendant Piderit maintained that he was just a "hacker" and may not be as familiar with certain terminology as non-self-educated programmers of similar ability. Dr. Davis commented further regarding the similarities between the programs, stating that substantial similarity also exists with regard to the breakdown of corresponding modules, the fundamental tasks performed, and the sorting criteria, among other elements. Davis did note the different programming styles of the two programs. With regard to this particular comment by Dr. Davis, the Court observes that even if the Chauffeur program, as a second comer, is an improvement of the Design

Flex program, this fact would not tend to vitiate finding infringement in these circumstances because the "improvements" are not such a departure from the standard.[13]

### iii. Testimony of William Dorn, Ph.D.

Dr. Dorn was selected as the Defendants' expert witness. Much of Dr. Dorn's testimony was directed not at considering the similarities in the programs, but offering explanation as to how Defendant Piderit might have independently formulated the constants as well as other portions of the Chauffeur program. The expert testimony in this case was sought primarily to assist the Court as to factual matters arising in the context of the substantial similarity analysis. In this regard, Dr. Dorn's testimony regarding the possibility of independent development is of little assistance to the Court in comparing the similar elements of the computer programs. The Court also asked Dr. Dorn, on re-cross-examination, whether he relied on Defendant Piderit's statements that he wrote the program and that he arrived at the constants by doing calculations in his head, to which he responded in the affirmative. It would of course be much simpler if this Court were only required to consider a purported author's credibility in determining whether he wrote the program independent of an already existing program. In performing the substantial similarity test, however, this credibility is only one of many factors to be considered.

Regarding the importance of the constants, Dr. Dorn also stated that he didn't consider the significance of these because they were of "minuscule" importance. In commenting on Dr. Davis' statement that it was extraordinary that Defendant Piderit could calculate the constants in his head, Dr. Dorn said that Piderit simply did not adopt such a formal approach as the one described by Dr. Davis.

---

**13.** Of interest here is a discussion concerning infringement actions where the alleged infringing material is a "new and improved" version of an already existing program. Note, *An Analysis of the Copyrightability of the "Look and Feel" of* a *Computer Program: Lotus v. Paperback Software,* 52 Ohio State L.J. 947 (1991). Even by the standard of this article, the Chauffeur program does not offer a substantially significant benefit that the original does not offer.

### iv. Summary of Factual Findings from Expert Testimony

The Court will summarize the factual findings on substantial similarity as follows:

*Object and Source Code:* No evidence of copying; no similarity.

*Menus:* Substantially similar.

*Formulas:* Substantially Similar.

*Constants:* Identical.

*Data Flow:* Substantially similar.

*Control Flow:* Substantially similar.

*Programming Style:* Differences, consistent with independent development.

*Level of Complexity:* Expressions used have similar "look and feel."

*Install Files:* Substantially similar, nearly verbatim copy.

*Engineering Calculation Modules:* Substantially similar behavior.

*Design Modules (V–Belt Algorithms):* Similar overall structure and organization.

*Fundamental Tasks:* Substantially similar.

*Sorting Criteria (Organization of Data):* Substantially similar.

*Common Errors/Misbehaviors:* Substantially similar.

Here, the Court will concur with Dr. Davis's conclusion that the only explanation regarding the constants, the install files, and the overall data flow and presentation, is that the Chauffeur program was copied from the Design Flex program.

### b. The Intrinsic or Subjective Test

To the extent that the intrinsic test is relevant to the factual findings, the parties did undertake a demonstration of the two programs, and the undersigned judge, being largely unfamiliar with computers and their processes, will make only this brief observation. The Court did note significant similarities in the running of the two programs, while the appearance of the screens was different, the content and method of proceeding through calculations were quite similar, as was the overall operation of the two programs.

### c. The Abstractions Test

This test was formulated by Judge Learned Hand in *Nichols v. Universal Pictures Corp.,* 45 F.2d 119 (2d Cir.1930), *aff'g* 34 F.2d 145 (S.D.N.Y.1929), *cert. denied,* 282 U.S. 902, 51 S.Ct. 216, 75 L.Ed. 795 (1931), and *Sheldon v. Metro–Goldwyn Pictures Corp.,* 81 F.2d 49 (2d Cir.1936), *rev'g* 7 F.Supp. 837 (S.D.N.Y.1934), *cert. denied,* 298 U.S. 669, 56 S.Ct. 835, 80 L.Ed. 1392 (1936), and can be used in the determination of whether a plagiarizing work has taken only the uncopyrightable ideas or the copyrightable expression from a copyrighted work. It seems only logical that this type of analysis would be undertaken after the application of the substantial similarity test, at which time the fact-finder has determined whether the work is a "plagiarizing work" of the copyrighted work.

At this point, the Court must "dissect" the similarities or otherwise analyze the legal substance between the two programs. This is much easier said than done, as it involves categorization of all the material considered under the extrinsic and intrinsic tests along the lines of idea and expression, and further, whether the particular expression employed is actually protected from infringement (e.g., is not dedicated to the public domain, or is expression which necessarily flows from an idea (scènes à faire)). The Defendants urged this Court to undertake the "sifting" process *before* the substantial similarity test is performed. The Court rejects such an approach on the grounds that it has the real potential to eviscerate the application of the prevailing substantial similarity test as defined by *Whelan* and its progeny, and in return offers little in the way of establishing any more workable alternative. In addition, the application of the abstractions test, not instead of, but in addition to the two-step test, serves as a guard against unprotectable elements being considered in the legal conclusion of whether there is infringement (based on the factual considerations of the extrinsic and intrinsic tests). Defendants apparently rely on *Data East* for the proposition that all elements of similarity that are not within the scope of copyright must

first be excluded from consideration by the court before looking for substantial similarity (Defendants' proposed findings and conclusions at 53). However, this is not an accurate statement of the court's ruling in *Data East*, 862 F.2d at 204. In that case the court undertook the two-step test for determining substantial similarity (using the extrinsic and intrinsic tests) of two computer games involving karate, holding that the games were substantially similar under the extrinsic test, but the Ninth Circuit took issue with, and reversed the district court on the second step of the test. In considering the intrinsic test to determine whether similarity of the expression of the idea occurs, the Ninth Circuit reversed the district court on the grounds that the district court failed to adequately separate protectable from unprotectable (here under the scènes à faire doctrine) expression. 862 F.2d at 208–09.

Any sifting or dissecting of protectable from unprotectable elements before the two-step test is applied (or other considerations associated with this test) would be wholly inconsistent with case law authorities. Nor does the late Professor Nimmer seem to advocate such a preemptive sifting. 3 Nimmer § 13.03[F] at 13–78.44—78.46 (1991). The abstractions test figures into this analysis, coming after the factual findings of substantial similarity test are marshalled, to assist the Court in determining whether, as a matter of law, the factual findings support a conclusion that there is infringement. Judge Learned Hand described the process as such: "If the copyrighted work is therefore original, the public demesne is important only on the issue of infringement; that is, so far as it may break the force of the inference to be drawn from likenesses between the work and the putative piracy." *Sheldon v. Metro–Goldwyn Pictures Corp.*, 81 F.2d at 54.

The abstractions test is essentially a sliding scale which attempts to form a continuum between literal and nonliteral aspects of a computer program. Naturally, the focal point of the dispute concerns the nonliteral elements, as it is relatively well-established that the literal elements of a computer program (the source and object codes) are protected expression under the copyright law. Judge Hand's observation in the *Nichols* case is helpful here: "It follows that the less developed the characters, the less they can be copyrighted; that is the penalty an author must bear for marking them too indistinctly." *Nichols v. Universal Pictures Corp.*, 45 F.2d at 121.

d. The Doctrine of Merger

 The doctrine of merger is related to the idea-expression dichotomy, and can be found to exist "[w]hen the 'idea' and its 'expression' are thus inseparable, copying the 'expression' will not be barred, since protecting the 'expression' would confer a monopoly of the 'idea' upon the copyright owner free of the conditions and limitations imposed by the patent law." *Herbert Rosenthal Jewelry Corp. v. Kalpakian*, 446 F.2d 738, 742 (9th Cir.1971). Defendants have not raised the merger doctrine as a defense in the course of these proceedings, but they have cited at least one authority for a statement of the scènes à faire doctrine.[14] The merger doctrine may be said to be considered generally as a question arising under infringement, and not copyrightability. See *N.E.C. v. Intel*, 10 U.S.P.Q.2d 1177, 1179, 1989 WL 67434 (N.D.Cal.1989). In light of the discussion above regarding the abstractions test, any additional analysis here is unnecessary.

e. Scènes à Faire Doctrine

Like the doctrine of merger, this doctrine stems from a situation where there is essentially one single way to express an idea. This encompasses details which necessarily stem from a particular "genre" or "scenes

---

**14.** See Defendants' Third Supplemental Legal Precedents Submitted to the Court, which cites to a three page summation of a bench ruling on motions in *Apple Computer v. Microsoft Corp. & Hewlett–Packard*, 1992 WL 75423 (April 14, 1992, N.D.Cal., Action no. C–88–20149–VRW). This source, which provides very little substantive insight into a previous bench ruling on motions, is of little persuasive import.

which 'must' be done." [15] However, Defendants have made no attempt, apart from a passing reference in the Fifth Supplemental submission of authorities, to establish any common "theme" or "plot" which would render the application of this doctrine appropriate. The Court is unable to infer such a basic set of circumstances which would effectively dictate the similarities present here. The authority to which the Defendants cite is of no apparent relevance.

### 5. Conclusions of Law as to the Existence of Substantial Similarity

At this point it is appropriate for the Court to "sift out" the factual findings which are not properly considered in making the legal conclusion as to whether substantial similarity exists. The Court must determine the legal significance of the factual findings which are not excluded due to their unprotectability. In this regard, quantity plays a minor role in relation to quality.[16] The Defendants may argue that the infringement action is based on "four little numbers," (referring to the mathematical constants) but in fact these numbers, lie at the heart of the dispute. There also remain other features apart from the constants to consider in making this legal determination.

#### a. Abstractions Test

Several of the elements of the programs listed above are relevant for discussion here. With regard to data flow and control flow, the "sliding scale" here dictates that the flow of these two types of information are closer to the expression of how the task is performed than the idea of undertaking calculation of belts and drives by use of computer program. Concerning the "look and feel" aspect as designated by level of complexity, the Court concludes that this aspect of the program is more connected to the idea end of the continuum, and accordingly this element is excluded from consideration. The modules of the program were also found to be substantially similar. These modules, like chapters of a novel or scenes from a play, performed particular functions—here the engineering calculations and the design aspect of the program (containing the V-belt design algorithms). Concerning the former module, it was noted that behavior was similar, and with the latter the similarity concerned overall structure and organization. With regard to the former module, this falls closer to the expression range because, although the pure engineering aspect in a broad sense may be more likely to be not protected, the relevant engineering modules in the two programs contain particular elements which perform in similar manners. The latter module is somewhat more difficult as it involves algorithms, or procedures for solving given types of mathematical problems. The Court here rejects the argument that while the remaining portion of the program is properly protected under copyright law, the algorithms, as a "process" can only be covered by patent law. Such a holding would tend to fragment further the rather tenuous continuity found in copyright law concerning computer programs. This conclusion is supported by the *Whelan* decision. 797 F.2d at 1229. Finally, the Court considers here the prospect of common errors and misbehaviors. The Court will respectfully disagree with the *Altai* decision and hold that a program's behavior can be protected by copyright law. A particular example of common error concerns the minimum/maximum error where both programs, upon receiving a particular answer, erroneously take the user back to another part of the program. In this example, the commonality of this error denotes "behavior" as to how one part of the program works with another. This is part of

---

**15.** 3 Nimmer § 13.03[B] at 13–69 (1991), citing *Atari, Inc. v. North American Philips Consumer Electronics Corp.*, 672 F.2d 607, 616 (7th Cir. 1982).

**16.** Nimmer has written that such similarity is not *de minimis* where a small portion of structure or code gives a program distinctive features or makes it especially creative or desirable, a finding of substantial similarity would be appropriate. 3 Nimmer § 13.03[F] at 13–78.46—47 (1991).

the creative expression of the program itself.

### b. Merger Doctrine

The only element considered in the list above relevant to the merger doctrine concerns fundamental tasks which are substantially similar. Although "fundamental tasks" may in a broader sense merely describe what are necessary means to effect a particular end, the term here is more specific due to the types of tasks which were available to achieve the particular end of designing belts and drives. For this reason, explained more fully in the testimony of Dr. Davis, the merger doctrine is not applicable to this portion. Defendants have argued that the install files are also appropriately excluded, but while the Court concludes that such files may be necessary to execute the programs (part of their "fundamental tasks"), the merger doctrine will not lead to a conclusion that these files cannot be protected.

### c. Previous Publication

The formulas which are identical in the two programs, were previously published and thus cannot be considered part of the protected elements of the Design Flex program.

### d. Legal Conclusions

The Court has "pared down" those elements of the Design Flex program which are not properly protected by the law of copyright. The remaining portions, still numerous, are of a quality which is undeniable. With special regard to the mathematical constants, which are totally unique to the Gates's belt system (testimony demonstrated that other competitors of Gates had little use for such constants because they used different types of belts or a different sizing scheme), the Court concludes here that the remaining elements from the substantial similarity test, as well as the finding of access, dictate but one outcome: Defendants infringed Plaintiff's copyright to Design Flex 4.0 in their use of the Chauffeur 1.01 program.

### 6. *Independent Development*

██ Evidence of independent creation can rebut the inference of copying which arises once access and substantial similarity are established. *Ford Motor Co. v. Summit Motor Products, Inc.*, 930 F.2d at 295. This question of fact is considered lastly here because of its limited role of rebutting the inference above. The testimony of Defendant Piderit is of particular importance here.

Defendant Piderit testified extensively on direct examination regarding whether he possessed the ability to write a program such as Chauffeur. However, the relevant issue is not whether Piderit could have written the Chauffeur program, rather it is whether the Chauffeur program infringes the copyright on Design Flex. In this context, Piderit's testimony was relevant to independent development as an attempt to rebut the Plaintiff's prima facie case. Piderit also testified briefly and in very general fashion about the characteristics of other "programs" used by competitors of Gates and Bando. A large portion of Piderit's testimony, both on direct and cross-examination, was devoted to his derivation of the mathematical constants used in the Chauffeur program. In the course of cross-examination, when Piderit was asked to perform a demonstration employing a program known as "Quattro Pro," Piderit commented that the version of that program was not the same version as he had used in his direct testimony. Counsel for Defendants had been explicitly directed to retain the exact copy of the program used in direct examination so that it would be available for use by the Plaintiff on cross-examination. This was not done, and counsel for the Defendants were unable to sufficiently explain this "oversight."

There were several instances of contradiction in testimony which were brought out in cross-examination. For example, Piderit testified on direct examination that he destroyed the Design Flex and Life in Hours diskettes which he retained after leaving the Plaintiff's employ, and kept no computer programs belonging to Gates. However, on cross-examination, Piderit ad-

mitted to copying and taking with him a program called "Data Access," which belonged to Gates. He stated that he couldn't recall whether he had copied the program onto the Bando computer (the program was found on the menu at the Bando office). Piderit also stated that he had the source and/or object code of the Design Flex program on his home computer, but maintained that he destroyed that information in "late October," some weeks after he quit working for Gates (he also kept the Life in Hours source code on his home computer). On cross-examination, Piderit also stated that he took a copy of a program known as "Multi Mate," but contended that the program did not "belong" to Gates, because it was given to them by someone else. Piderit then stated on cross-examination that he was unaware that the Design Flex program was on the Bando computer at the time he was writing the Chauffeur program. Cross-examination also placed a large shadow over Piderit's version of how he arrived at the constants. In answering a question posed by Plaintiff's counsel about why the Design Flex constants would be changed slightly, Piderit stated there was no reason to change the Gates numbers as they "are published in Gates's manual." Substantial questions were also raised, casting doubt not only on the statements of Piderit, but also on the representations of counsel for the Defendants, regarding the erasure of particular files from the Bando computer on February 6, 1992. Based on the lack of credibility of Defendant Piderit's testimony, and coupled with other testimony heard at the hearing on the motion for permanent injunction, the Defendants have failed to rebut the presumption of copying. The Court must therefore conclude that the Chauffeur program infringes the copyright of the Plaintiff's Design Flex program. The injunctive relief on behalf of the Plaintiff is considered below after the trade secrets issue is discussed.

As to copying and independent development, Piderit, as creator of the Chauffeur program, has maintained that, although he may have used the Design Flex as a model, template, or inspiration, so that copying may have taken place as a factual matter, there was no copying as a legal matter. This defense that there was no actionable appropriation is of no avail to the Defendants, as substantial portions of the material copied from the Design Flex program are protectable expression. See, *e.g.*, 3 Nimmer § 13.01[B] at 13–8 (1991). While it can fairly be said that not all copying amounts to infringement, the copying by Defendants of the Plaintiff's program is certainly infringement.

Finally, the Court must note with regard to independent creation that this defense is to some extent inconsistent with Defendants' other arguments—in particular there appears to be three alternatives regarding the constants. One source which was advanced early in the proceedings concerned the rather mysterious notebook authored by the former Bando engineer, Mickey Yamaguchi. Defendant Piderit later testified that he formulated the constants by his own mental process over the course of about thirty minutes of random calculation. To add to this confusion, Plaintiff brought out on the cross-examination of Allen Hanano that he informed an employee at Goodyear (in a telephone conversation) that the constants were derived from tests performed in the Bando laboratories in Japan.[17] The inconsistency of the independent development arguments detracts substantially from any force it might otherwise have had to rebut the presumption in Plaintiff's favor regarding copying. With regard to other theories of the defense, these likewise fail in any way to rebut the presumption of copying as a result of the substantial similarity test.

### III. Misappropriation of Trade Secrets

The primary issue which the Court must treat regarding this claim is the preemption

---

**17.** The deposition of Roy Semin, an employee of Goodyear, submitted as Plaintiff's exhibit 182A, describes in detail the conversation with Allen Hanano, as well as the deponent's perceptions regarding the reason he was contacted by Hana- no—"to get Goodyear to admit that somewhere in our publications, something that we had made public, that we had used these numbers." At 15, l. 13–15.

issue. The Copyright Act, 17 U.S.C. § 301, sets forth the test for preemption of state statutory or common law claims which may conflict with the Act:

(a) On and after January 1, 1978, all legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106 in works of authorship that are fixed in a tangible medium of expression and come within the subject matter of copyright as specified by sections 102 and 103, whether created before or after that date and whether published or unpublished, are governed exclusively by this title. Thereafter, no person is entitled to any such right or equivalent right in any such work under the common law or statutes of any State.

(b) Nothing in this title annuls or limits any rights or remedies under the common law or statutes of any State with respect to—

(1) subject matter that does not come within the subject matter of copyright as specified by sections 102 and 103, including works of authorship not fixed in any tangible medium of expression; or

(2) any cause of action arising from undertakings commenced before January 1, 1978;

(3) activities violating legal or equitable rights that are not equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106; or

. . . . .

■■■ The statute contains a two-part analysis: first, the work of authorship in which rights are claimed must fall within the "subject matter of copyright" as defined in §§ 102 and 103 of the Act; second, the statute requires that a state law create "legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright as specified in § 106.[18] Both of these criteria must be met in order for a state claim to be

preempted. *Harper & Row Publishers, Inc. v. Nation Enterprises,* 723 F.2d 195, 200 (2d Cir.1983). In *Harper & Row,* Judge Kaufman explained that "[w]hen a right defined by state law may be abridged by an act which, in and of itself, would infringe one of the exclusive rights, the state law in question must be deemed preempted." *Id.* (citations omitted). In the next sentence he continued: "Conversely, when a state law violation is predicated upon an act incorporating elements beyond mere reproduction or the like, the rights involved are not equivalent and preemption will not occur." *Id.* (citations omitted).

■■■ Copyright law preemption is both explicit and broad, and provides the sole remedy for unsanctioned duplication of materials subject to copyright. However, federal copyright law governs only copying. If violation of a state right is predicated upon an act incorporating elements beyond mere reproduction, there is no preemption. *G.S. Rasmussen & Associates v. Kalitta Flying Service,* 958 F.2d 896, 904 (9th Cir. 1992) (citations omitted). The Court will now undertake the two-step analysis outlined above to determine whether the Plaintiff's trade secrets claim is preempted.

A. Whether the Subject of the Trade Secrets Claim Falls Within the Subject Matter of the Copyright Act

Plaintiff's amended complaint alleges four claims for relief: unfair competition by Bando American, Inc. and Bando Chemical, Ltd.; misappropriation of trade secrets by all Defendants; infringement of copyright by all Defendants; and breach of contract by Ron Newman, Steven Piderit and Denise Hanano. The second claim for misappropriation of trade secrets is filed under C.R.S. § 7–74–102(4). This statute defines misappropriation as *either* acquisition or disclosure. In its supplemental brief filed in support of its motion for injunctive relief, filed March 24, 1992, Plaintiff based its trade secret claim on both elements of the statute. This was

---

**18.** This two-step analysis, worded slightly differently, is also found in 1 Nimmer § 1.01[B] at 1– 11 (1991).

also argued in closing argument. Here the Court considers the constants as the subject of the claim, as Plaintiff has declined to pursue its trade secrets claim regarding Design Flex as a whole. There was not sufficient evidence presented at the hearing as to the trade secret claim on the Life in Hours program, and accordingly, the Court will reserve that portion of the Plaintiff's second claim for resolution at trial. The proper question here is not simply whether the constants themselves are subject to protection by copyright law, because as part of the Design Flex they most certainly are, but the Court's analysis must continue to the remaining portion of the two-step analysis. For this reason, the Court finds the case authorities cited in Defendants' Sixth Supplemental Legal Precedents of marginal assistance.

### B. Whether the State Trade Secrets Claim Creates Rights Equivalent to Any Exclusive Rights of Copyright Law

■■■■ Here the relevant question is whether, under the Colorado statute, the act of reproduction, performance, distribution or display, will *in itself* violate the state created right, then the claim is preempted. See 1 Nimmer § 1.01[B][1] at 1–14 (1991). If the Colorado statute requires other elements, in addition to or instead of the elements above (preempted by copyright), then there is no preemption. Concerning the misappropriation of the constant by acquisition and disclosure, it is clear that the trade secret claim here does not involve elements equivalent to those found in the Copyright Act. The Plaintiff's claim goes to the wrongful acquisition by Piderit or other Defendants of the constants from the exclusive dominion of the Plaintiff [19] as well as the consequent disclosure of the constants to Defendant Bando and others. The acts of acquisition and disclosure of the constants do not necessarily involve infringement of a copyright, and accordingly, the Court concludes that Plain-

tiff's trade secret claim on the constants is not preempted.

As the Court has concluded there is no preemption of this claim, it is appropriate to find that Plaintiff has established the elements of the claim. The Court also finds that Defendants' misappropriation was willful and malicious. This finding is made pursuant to C.R.S. § 7–4–105, the provision regarding attorney's fees in the Colorado Uniform Trade Secrets Act. In addition, due to the nature of these constants (the fact that they are uniquely applicable to Plaintiff's belts and its belt selection system), the Court finds it appropriate in the interests of equity to enter an injunction barring the Defendants' use of these constants—either the constants used by the Plaintiff, taken to the fourth decimal point, or the same constants used by Defendants, taken to the second decimal point).

### IV. Scope of Injunctive Relief

#### A. Injunction on the Copyright Infringement Claim

■■■■ Section 502(a) of the Copyright Act provides that a prevailing plaintiff in an infringement action may obtain, in addition to monetary recovery, a permanent injunction restraining further infringement. Based on the foregoing discussion and conclusions, the Court finds it necessary and appropriate to fashion an injunction coterminous with the infringement. 3 Nimmer § 14.06[C] at 14–92 (1991). Plaintiff has prevailed on its copyright infringement claim against Defendants. The Chauffeur program is an infringing work. For these reasons, it is appropriate that a permanent injunction restraining further infringement issue.

This injunction shall remain in force and effect until further order of court. Defendants Bando American, Inc., Steven R. Piderit, Ron Newman, and Bando American agents and employees, and any person or persons acting in concert with them, are hereby enjoined from using or distributing

---

19. It is undisputed that all the individual Defendants, upon leaving the Plaintiff's employ, signed statements to the effect that they would not use proprietary or confidential material belonging to *Gates*, of which the constants were a part.

the Chauffeur program. Defendants are ordered to provide a copy of this Order to any persons which have been provided the Chauffeur program, and to retrieve any and all copies of the Chauffeur program which may have been distributed to Bando customers or others, they are also order to return to the Plaintiff any and all copies of the Design Flex program, or portions of it, which Defendants or their agents may have obtained. Defendants shall surrender to the Court within a reasonable time all such retrieved copies of the Chauffeur program. Because this is a permanent injunction, no bond is necessary.

Defendants shall cease and desist further use of the Chauffeur program.

Pursuant to § 505 of the Act, and C.R.S. § 7–74–105, Plaintiff shall also recover its costs. Plaintiff may include reasonable attorney's fees as part of its costs. Plaintiff shall file a submission of its costs, including attorney's fees, on or before July 31, 1992. Defendants may file an objection, not to exceed ten pages, on or before August 12, 1992.

### B. Injunction on the Trade Secrets Claim

■ For the trade secrets claim regarding the mathematical constants, the Defendants are ordered to return any and all information containing the constants used in either the Chauffeur program or the Design Flex program. Defendants, their agents, and employees, and any person or persons acting in concert with them are restrained from further use of these constants.

Accordingly, Plaintiff's motion for permanent injunction is GRANTED to the extent described in this Order.

The Court further holds, *sua sponte*, that this matter is appropriate for certification under Fed.R.Civ.P. 54(b), and that there is no just reason for delay from judgment on the copyright infringement claim and the trade secrets claim (to the extent it is disposed of in this order).

## ORDER

THIS MATTER comes before the Court on the following motions:

1. Plaintiff's motion to file second amended complaint, filed July 1, 1992;

2. Plaintiff's motion to amend the Order of June 26, 1992, pursuant to Fed. R.Civ.P. 59(e), filed July 2, 1992; and

3. Defendants' motion to amend and make additional findings, to alter and amend judgment, or for a new trial, and to stay enforcement of judgment, pursuant to Fed.R.Civ.P. 59(e), 59(e) and 62(b), filed July 6, 1992.

1. *Plaintiff's motion to file second amended complaint.* The Plaintiff seeks to file a second amended complaint which includes an additional claim for civil conspiracy, the allegation of additional wrongful facts falling within existing claims, and adds new defendants to the action. Defendants filed their opposition to this motion on July 13, 1992. Plaintiff's motion to file second amended complaint is GRANTED.

2. *Plaintiff's motion to amend the Order of June 26, 1992.* In this motion, Plaintiff seeks to make certain corrections to the order granting the Plaintiff's motion for permanent injunction. The Plaintiff's motion is GRANTED to the following extent: ■

1. Page 4 of the order, in the paragraph below "Statement of Issues," and in the fourth line of the paragraph should read "Design Flex" instead of "Life in Hours;"

2. Page 34 of the order, in the second full paragraph and in the seventh line should read "Bando computer" instead of "Gates computer;"

3. Page 39 of the order, after the first sentence of the first full paragraph should be inserted: "The Court also finds that Defendants' misappropriation was willful and malicious. This finding is made pursuant to C.R.S. § 7–4–105, the provision regarding attorney's fees in the Colorado Uniform Trade Secrets Act."

4. Page 40 of the order, in the second full paragraph, after "Pursuant to § 505

of the Act, insert "and C.R.S. § 7–74–105," before "Plaintiff shall also recover its costs."

The remaining relief in Plaintiff's motion to amend is otherwise DENIED.

3. *Defendants' motion to amend and make additional findings.* There are three separate grounds for the motion: Fed.R.Civ.P. Rules 59(a), 59(e), and 62(b). The Court will consider each ground in turn.

### Rule 59(e)

Defendants offer fifteen separate grounds for the motion to alter or amend judgment. In the first numbered paragraph, Defendants cite to the new decision affirming *Computer Associates, Inc. v. Altai, Inc.*, 775 F.Supp. 544 (E.D.N.Y.1991), decided by the Second Circuit June 22, 1992. The Second Circuit upheld Judge Pratt's decision. It also specifically approved the three-step analytical process of first considering abstraction, then filtration (of unprotectable elements), and lastly comparison (to determine similarity). This approach is still a minority view, and the Second Circuit's opinion does not provide appropriate grounds for relief under Rule 59(e). With regard to access, Defendants argue that this finding was made in error because Defendant Piderit had denied having access to the source codes of either the Life in Hours or the Design Flex programs. This argument ignores the fact that the Court found much of Piderit's testimony to be not credible. Concerning the Defendants' arguments in the third and fourth numbered paragraphs of their motion, the Defendants are instructed to read paragraph d. on page 33, regarding idea versus expression, and to reread page 10 concerning derivative works.

Defendants raise a new argument in paragraph number five, and the relief sought in paragraph six is inappropriate. Paragraph seven is merely a reargument of issues already decided pertaining to independent development as a defense. Concerning this same defense in regard to paragraph eight, the Court notes that the issue is not whether Piderit *could have* written the program, but rather whether he actually *did* write the program. In paragraph nine Defendants object to the use of "approximately 38%" as the market share of Gates, because this issue has not been fully litigated. This number, which was not "fully litigated" because it is not particularly relevant to the copyright issues, is obviously not part of the findings and conclusions made by this Court. The Court will not reconsider the merger issue in paragraph ten. Paragraph eleven argues that this Court has failed to make specific findings as to the standards for injunctive relief (based on authorities submitted by Defendants). These specific findings are not necessary when the injunction entered is permanent in nature. (This is also relevant to paragraph twelve.) The Court will not consider the arguments contained in paragraphs thirteen through fifteen. The Court does not find any of the grounds listed by Defendants to be appropriate grounds for the alteration or amendment of the injunction order. Accordingly, Defendants' motion under Rule 59(e) is DENIED.

### Rule 59(a)

This motion for new trial is predicated upon the existence of "manifest errors of law and fact." There were approximately forty hours (over the course of nine days) spent on the hearing on the permanent injunction alone. The Defendants' motion for new trial is DENIED.

### Rule 62(b)

Defendants' move to stay is inappropriate as the Court has already denied the relief sought under 59(a) and 59(e). The motion under Rule 62(b) is DENIED.

Accordingly, the following Order shall enter:

1. Plaintiff's motion to file second amended complaint, filed July 1, 1992 is GRANTED;

2. Plaintiff's motion to amend the Order of June 26, 1992, pursuant to Fed. R.Civ.P. 59(e), filed July 2, 1992 is GRANTED in part and DENIED in part; and

3. Defendants' motion to amend and make additional findings, to alter and amend judgment, or for a new trial, and

to stay enforcement of judgment, pursuant to Fed.R.Civ.P. 59(e), 59(e) and 62(b), filed July 6, 1992 is DENIED.